Van Dusen, J.,

Apportionment of proceeds of sale of real estate acquired under mortgage foreclosure

The trustees foreclosed mortgages and, after an interval, sold the properties. In each case the sale price was less than the mortgage, or at least less than the mortgage plus expenses of foreclosure and other items charged to principal. There was no net revenue pending resale. The auditing judge directed that the amount realized should be apportioned between principal and income according to the following rule:
“I rule that the proceeds of sale of real estate acquired through foreclosure of mortgages shall be apportioned between the life tenants and the principal of the trust. It is directed that such apportionment shall be calculated in the following manner: First, ascertain the total amount of principal expended on the property foreclosed, including the original amount of the mortgage, the expenses of foreclosure, the amounts paid for carrying *6 charges during the period of ownership of the property by the trustees, the delinquent taxes at the time of foreclosure and the taxes accrued during the period of ownership by the trustees less any amount of rent received; second, ascertain the amount of income loss to the life tenants, including the interest due and in default at the time of the sheriff’s sale and the income withheld from the life tenants, consisting of interest at the rate fixed by the mortgage on the principal invested in the property during the period of ownership by the trustees; third, ascertain the amount to be apportioned, which consists of the proceeds of sale of the property less expenses incidental thereto, such as broker’s commission, counsel fee, etc. The total amount of principal and income found first and second as above represents the investment in the property by the estate, and that total figure is to be used as a basis of making the apportionment to income.
“The apportionment to income is purely mathematical and, of course, is the proportion which the total income loss bears to the total of both principal and income investment. In other words, the total income loss (found second as above) used as a numerator, and the total principal and income investment (found first and second as above). used as denominator, gives the fraction which, multiplied by the proceeds of sale of the property (found third as above) gives the amount to be apportioned to income.”
This disposition of the question is concurred in by the life tenants. Exceptions were filed on this point by the trustees of the decedent’s estate. The trustees do not question the justice of this rule in the ordinary case; but they say that because of the language of this particular will income is not to share in the result of any salvage. The life tenants from the same language argue to the contrary. Neither side, in our opinion, gets any aid from the particular language of the will, which is that the trustees shall “pay over the net rents, issues, interest, income, dividends and revenues thereof” to the life tenants. This is the ordinary verbiage of testators, and we are unable *7 to see how it can affect the application of the general law on the subject. In effect it means “income”. We also question the standing of the trustees to file exceptions on this point. They are stakeholders only and are no more interested in distribution to principal than to income.
Exceptions were also filed by the guardian and trustee ad litem representing remaindermen. The guardian has made some excellent observations and criticisms; and we have an example of the usefulness of the practice of appointing guardians ad litem and the aid which the court gets from opposing arguments even if they are not accepted : See Tyson’s Estate, 191 Pa. 218.
The most important part of the formula is that part which gives income a share in the salvage, which is not determined at the time of the foreclosure sale, but at the time of realization from the salvage operation. This conclusion is supported by the American Law Institute’s Restatement of the Law of Trusts, § 241, by the Pennsylvania cases of Colket’s Estate, 20 W. N. C. 71, Rahm’s Estate, 28 Pitts. 453, and Kenworthy’s Estate, 21 D. & C. 150, by the dicta in Dornan’s Estate, 19 D. & C. 539, and by almost unanimous authority in other States. A contrary authority is found in the decision of Hannum, P. J., of Delaware County, in Spear’s Estate, recently filed but not reported. In this case even arrears of interest at the time of foreclosure were denied any claim upon the foreclosed property. Articles discussing the main question, and numerous other questions which arise, are found in 84 U. of P. Law Rev. 157, 327, 625, 18 Mass. Law Quarterly, August 1933, p. 81, 90 N. Y. L. J., nos. 37, 38, 39, 57 Trust Companies Magazine 245, 65 C. J. 822, § 705.
We will examine the criticisms made by the guardian ad litem in order to test the principle and to determine whether some of the particulars may not require modification. The matter was presented and the rule has been stated generally. When it comes to rearranging the figures relating to each item (there are 42 properties in *8 volved) in the schedule of distribution, additional questions may be discovered. These questions can be determined in settling the schedule, after argument and subject to exception if necessary. We will try to refrain from dicta as far as possible in this opinion, as all the questions present difficulties and it is better to wait until the facts are before us than to try to settle everything in advance and perhaps do it wrong. Wisdom sometimes comes from the persuasion of events, as well as of logic.
The chief criticism, is that there is no real income from the foreclosed property if it remains unproductive; that part of the principal is being taken to make good a loss of income; and that the fact that principal gets all the profit of a resale, if any, shows that principal is the owner of the whole fund. This argument overlooks the nature of the trustees’ original investment. They did not buy a share of stock or a house; they lent money on security. Interest on the debt runs on day and night. The amount of principal is fixed. The share of stock or the house may earn income or it may not. It may increase in value or it may shrink in value. When, therefore, it becomes necessary to foredose on the security, the property thus acquired should continue to be treated like the debt which the trustees are trying to save. This is recognized by the doctrine of equitable conversion, according to which the land acquired in foreclosure by the trustees is regarded as personal property in their hands. The security was given for the benefit of principal and income, not only present income but future income, which is running on all the time. If both principal and arrears cannot be saved, then both should bear the loss pro rata, because they are pro rata owners. This distinction is noted by the author of the article in the Massachusetts Law Quarterly. If there should be a gain, we will deal with the problem when it arises.
Attention is called to the different methods supposed to be used in the different cases for calculating income’s share. On examination it will be found that the rules *9 amount to the same in the end, except that version of the rule which allows arrears of interest in full, which is clearly wrong.
Reference is made to the theories of dealing with unproductive property owned by a trust estate. It will not be necessary to state the various theories, because, as has been said, we are not dealing with a. piece of property, but with something which stands instead of a debt and the interest thereon. The A. L. I. Restatement of the Law of Trusts adopts for unproductive property the theory which we are discussing, and applies it, in section 241, note (b), to property acquired by mortgage foreclosure. As noted above, we do not think the analogy is perfect.
Objection is made to the allowance of interest after foreclosure at the rate called for in the mortgage, and it is said that interest should be allowed only at the rate customarily earned by investments during that time. At this point also arises the question of interest on the sums advanced by principal to carry the property. These sums are to be regarded as additional investments, and, inasmuch as income loses the interest which would have been earned if these sums were otherwise invested, interest ought to run in favor of income account on these sums. Such interest should be at the current rate earned by investments, and we think that interest on the original debt after the foreclosure sale should be calculated at the current rate also. The weight of authority, as noted in 84 U. of P. Law Rev. 157, supports this conclusion. As said in the New York article:
“The life beneficiary has merely lost the interest which he would have received had the mortgage been paid and the proceeds reinvested by the trustees at the rate of interest then prevailing. This may be more or less than the interest reserved in the mortgage”.
A real difficulty arises with respect to the net rents pending resale. The argument of the trustees assumes that the gross rents have been overlooked; but upon ex- *10 animation it will be seen that the formula directs that such rents be deducted from carrying charges, thus lessening the amount which principal is called upon to advance. If there are no net current rents it makes no difference that income and outgo pending resale are thrown into a common account with the other items, which is what the formula requires. It is said there are no net rents in the present case, though there may be when certain items are taken from income account and put into the common account. As we are dealing at this time only with items as to which the salvage operation is over> it is not necessary to decide what should be done with net current rents, if any, before filial distribution. To avoid misunderstanding, however, we note the possibility that when the case arises it may be found practically wise to depart from strict logic and give net current rents to the life tenant, as a minimum income and on account of his arrears of income, rather than bid him starve. There is also a question as to what are net current rents.
A plea is made that principal should receive return in full of the additional sums advanced to finance the salvage operation. Principal is the “rich relation” and must do the financing, if it has the spare cash; otherwise there is no one to do it. Once the trustees are committed to the unfortunate investment they are bound to see it through. If additional investment is called for, it is really no different from an original investment of that much more. The final investment is the net result of the poor venture, and principal will have to stand its share of the additional loss. The suggestion that income must help to finance the salvage operation is not practical.
Objection is made to the burden of accounting put upon the trustees and the advantages of a rule of thumb. We think that the difficulties are exaggerated; any extra labor by the trustees can be compensated. A system of law which prefers to struggle with extraordinary and ordinary dividends rather than to use rules of thumb can accommodate itself to the rule under discussion.
*11 Attention is called to the fact that the proceeds of sale are not all cash, but are represented in part by purchase-money mortgages. We think that the cash purchase money should be distributed to income as far as it will go, and that the purchase-money mortgages should be regarded as reinvestments of principal. If there is not enough cash purchase money to pay income in full, then the amount of income locked up in purchase-money mortgages can be released when other principal becomes available for investment by investing such principal in the share of the purchase-money mortgage which represents income. While each salvage operation should be treated separately, yet if there is not enough cash in one operation to pay all the income due by that item, cash principal from other items can be invested in so much of the purchase-money mortgage as represents income, thus releasing the income locked up in the mortgage. It is to be supposed that the terms of the resale were prudent. If there is a default in the purchase-money mortgage, and a foreclosure is necessary, a new salvage operation begins.
It is said that the calculation of income’s share in the salvage should run, not from the date when the interest falls into arrears, but from the date when the investment became insecure, crediting on account the interest actually received since the date of the insecurity. We will not stop to explain this point in full. In the facts before us there is nothing to show that the investment became insecure before the interest fell into arrears, so we will express no opinion.
It is said that the theory of a salvage operation requires the continuance of the trust in many cases beyond the day when the distribution of principal is called for. While the situation does not occur here, we agree with the conclusion in Dornan’s Estate, supra, that the trust continues until liquidation is accomplished. A similar conclusion was arrived at in the case of Blair v. Pennsylvania Co., etc., et al., 24 D. & C. 490, recently decided *12 in the common pleas, which held that where a mortgage was owned by a trustee for several trusts, and the mortgagee was obliged to foreclose and buy in the property, the beneficiaries did not become tenants in common, entitled to partition, but the trust continued until the salvage operation was over. See also the Restatement of the Law of Trusts, § 241 (g). Spear’s Estate, supra, is to the contrary. The guardian ad litem asks at this point whether principal is to continue to finance the salvage operation although interest has ceased to accrue. This is what was done in Dornan’s Estate, and is all that was actually decided. Whether it is correct we will decide when the time comes.
We note that there are successive life tenants entitled to income. The salvage of income should be apportioned between them: Restatement of the Law of Trusts, § 241(f).
formula of the auditing judge is correct except that the statement of the second factor should be modified by allowing interest on the mortgage after the foreclosure and on advances by principal at the current rate for trust investments, in this case four percent, instead of the rate stipulated in the mortgage.
The exceptions of the trustees are dismissed. The exceptions of the trustee and guardian ad litem are dismissed, except that the adjudication is modified with respect to interest as above indicated. The exceptions of Theresa Burke Nixon-Nirdlinger et al., filed January 10, 1936, evidently out of caution, are unnecessary and are dismissed. The claim made by these exceptions is supported by the formula.

Other income accrued to death of life tenant

The life tenant is clearly entitled to all ordinary income accrued to his death, in spite of spendthrift provisions: Yates’ Estate, 4 D. & C. 569; or a direction to distribute half-yearly. The exceptions of Theresa Burke Nixon-Nirdlinger et al., filed April 20, 1935, are dismissed.

*13
Apportionment of dividend declared after the death of the first life tenant

The estate owned one fourth of the shares of the Klaw and Erlanger New Orleans Theatre Company, which were inventoried at $69,465. After the death of the testator dividends were received by the estate as follows:
July 22, 1919.................. $11,360.92
May 27, 1920.................. 12,500.00
July 5, 1920................... 4,000.00
May 21, 1921.................. 15,000.00
July 8, 1922................... 15,000.00
July 31, 1923.................. 15,000.00
June 10, 1924.................. 15,000.00
1925 ......................... none
1926 ......................... none
August 8, 1927................. 5,000.00
September 26, 1928............. 12,000.00
April 30,1929.................. 15,000.00
$119,860.92
1930 ......................... none
1931 ......................... none
March 30, 1932................. 25,000.00
$144,860.92
Frederick G. Nixon-Nirdlinger, one of the life tenants, died on March 11, 1931, before the declaration of the last-mentioned dividend. The trust continues and the share of income which he had been getting goes to another life tenant.
From the stipulated facts it appeared that this dividend amounted to only half of the surplus from accumulated earnings at the last dividend period, prior to the death of Frederick. Operations between the two last dividend periods showed a loss.
The auditing judge concluded “that this dividend, while perhaps unusual, nevertheless in law is still an or *14 dinary corporate cash dividend paid out of its current earnings”. The executors of the deceased life tenant conceded that it was an “ordinary” dividend, but they claimed that it should be apportioned to the date of his death, that is to say, that he should get a fraction of it whereof the numerator is the number of days between the last previous dividend and the time of his death, and the denominator is the whole number of days between the two dividends. This claim was made by reason of section 22 of the Fiduciaries Act of June 7, 1927, P. L. 447, which is as follows:
“All annuities, and all payments of rents, income, interest, or dividends of any real or personal property, directed by any will to be made during the lifetime of the beneficiary, or for the life or lives of another person or persons, or for a term of years, shall, like interest on money lent, be considered as accruing from day to day, and shall be apportioned to the date of the death of such beneficiary or of such cestui que vie, or to the end of such term of years.”
The auditing judge refused to make this apportionment on the ground that it was impossible and that it was contrary to authority.
The original state of the law was that all dividends went to the person who was entitled to income at the time they were declared and were not apportioned when there was a change in ownership between dividends. Corporate earnings are irregular, stockholders are not entitled to earnings until dividends are declared, and the declaration of dividends is uncertain and often irregular. Dividends therefore do not accrue from day to day. Rent was treated in the same way, perhaps because the rent with which the community was familiar in those days was farm rent payable in irregular sums on Lady Day, Midsummer’s Day, Michaelmas Day and Christmas Day, and not the monthly rent to which we have become accustomed.
*15 Interest, however, was always apportioned. This wás a recognition of the essential difference between interest and the earnings of property which has been pointed out in the other part of this opinion.
With the increase in the number of seasoned corporate securities with fairly regular earnings and uniform quarterly or half-yearly dividend checks, it came to seem “technical” and unfair that interest should be apportioned and dividends should not. Accordingly, section 22 of the Fiduciaries Act, supra, was enacted in Pennsylvania. Our statute still covers only part of the ground. It applies only to wills, and it directs apportionment at the end of a life estate or an estate for years, but not at the death of the testator. See Opperman’s Estate (No. 2), 319 Pa. 466. There is no reference to a remainder-man, and therefore the statute applies as well to the case where there is a succeeding life tenant, as here, as where the trust has come to an end.
Long before this statute, the law of extraordinary dividends had been developed, starting with Earp’s Appeal, 28 Pa. 368, under which the source of an extraordinary dividend is examined and so much of it as is necessary is taken to make good any impairment of intact value.
The statute is in general language, simply using the word “dividends”, and if read literally would apply to all dividends, regular and irregular, ordinary and extraordinary. In spite of the statute, the doctrine of Earp’s Appeal has continued to be applied. It has further been considered that the rest of an extraordinary dividend should be awarded to the person entitled to income during the period in which it was earned, instead of going to the person who was entitled to income when it was declared: Simpson’s Estate, 23 Dist. R. 27, which was decided before 1917; Graham’s Estate, 296 Pa. 436, which was decided after 1917. In the latter case no award was made, for lack of proper information, but the opinion clearly indicates the method which should *16 be used. There has been no suggestion that the rest of an extraordinary dividend should be apportioned under the statute.
As the note of the commissioners states, our statute is derived in part from the English Apportionment Acts. The preamble of the English statute of June 16, 1834, 4 & 5 William IV, ch. 22, refers to “Rents, Annuities, and other Payments due at fixed or stated Periods”. The enacting clause refers to “Rents, Annuities, Pensions, Dividends, Moduses, Compositions, and all other Payments of every Description . . . made payable or coming due at fixed Periods”. The apportionment statutes of New York, North Carolina, Virginia and West Virginia apply expressly to dividends, and all refer to “fixed periods”. The cases decided under these statutes hold that where dividends are payable at fixed periods according to the corporation charter there will be an apportionment, but not otherwise: Hartley v. Allen, 4 Jur. N. S. 500; Re Maxwell’s Trusts, 1 H. & M. 610, 71 Eng. Repr. 267; In re Brandreth’s Estate, 64 App. Div. 566, 72 N. Y. Supp. 333; In re Palmer’s Estate, 133 Misc. 159, 232 N. Y. Supp. 212. The English statute of 1870, 33 & 34 Victoria, ch. 35, directs the apportionment of “all rents, annuities, dividends, and other periodical payments”, but in defining the word “dividend” states that there shall be an apportionment “whether such payments shall be usually made or declared at any fixed times or otherwise”. There is no suggestion in the decisions of these jurisdictions of any practical difficulty in making the apportionment of dividends which are declared at fixed periods. There is no trace in the English cases of any difficulty in apportioning a dividend of any kind under the broad provisions of the statute of 1870. Nevertheless, such difficulties do exist.
We must put ourselves in the place of the man who is drawing the schedule of distribution. Unless he can know with reasonable certainty that a dividend of a cer *17 tain amount will be forthcoming within a reasonable time, he practically cannot apportion dividends. He does not know what sum to apportion or for what period. The only alternative is to wait indefinitely for the next dividend; and that is not fair to those who are entitled to distribution of principal. Once the stock is awarded and, transferred to the person entitled to it, it will be impossible for a deceased life tenant to obtain his share of a dividend thereafter declared. As applied to irregular dividends, the statute is impossible of practical application.
It makes no difference in the principle to be applied that the stock is still in the possession of the trustees and that no inconvenience actually arises in the case before us. The rights of the parties ought not to depend on accidents of that sort.
While our statute adopts neither the restricted definition of the English statute of 1834 and of the New York statute, nor the broad definition of the English statute of 1870, we think that the legislature must have had in mind only those dividends which are payable at fixed periods. The statute declares that the dividends of which it is speaking shall be treated “like interest on money lent”. This comparison is not true of dividends which are declared at irregular intervals and in irregular amounts, like the dividend which we are now considering. This conclusion enables us to avoid the practical difficulties which stand in the way of a literal application of the statute and to save as much of it as can be made ,to work.
As to authority: Our reading of the cases is that they do not touch the subject. In the opinions in which it is said in substance that “ordinary dividends are not apportionable”, notably McKeown’s Estate, 263 Pa. 78, and Nirdlinger’s Estate, 290 Pa. 457, there was no question before the court of apportioning a dividend under the statute at the end of a life estate. What was meant was *18 that such a dividend was not to be allocated to the period in which it was earned, like an extraordinary dividend, and the word “apportioned” was used in that sense. In the statute the word “apportioned” means “apportioned according to elapsed time”, “accruing from day to day”, which is something quite different, and it is in that sense that it is used in Opperman’s Estate, supra: “On a per diem basis as bond interest is apportioned”, and by Judge Gest in Thompson’s Estate, 6 D. & C. 503.
The latter is the only reported case in which the statute has actually been applied, and the dividends there dealt with, as the auditing judge notes, were fixed-period dividends.
This introduces into the law of dividends a third classification, a dividend not so extraordinary that its source will be inquired into, and which, therefore, must be called an ordinary dividend, and yet so irregular that it cannot be apportioned, and must lie where it falls. We do not feel called upon to define further the expression “fixed period”. In practice we believe that accountants will have no real difficulty in deciding this question and that the uncertainties will not be any greater than they are in the case of interest.
We note that the Restatement of the Law of Trusts, §236(d), does not provide for the apportionment of dividends ; also that the Uniform Principal and Income Act as first drafted provided for the apportionment of dividends, but that in the final draft dividends were stricken out: See the Proceedings of the Commissioners to Codify and Revise the Law of Decedents’ Estates for 1929.
The auditing judge concluded that the dividend in question was not an extraordinary dividend. The exceptants have accepted this conclusion. We are not required, therefore, to express any opinion of our own.
The exceptions of the executors of Frederick G. NixonNirdlinger are dismissed. His widow and children claim under him, and their exceptions are dismissed. The adjudication is confirmed absolutely.