## Mark's Estate

Before Van Dusen, P. J., Stearne, Sinkler, Klein, Bolger, and Ladner, JJ.

*I. Louis Rubin,* for exceptants.

*Murdock K. Goodwin,* and *Arthur Littleton,* of *Morgan, Lewis & Bockius,* contra.

KLEIN, J., April 5, 1940.—Decedent, Louis Mark, died September 29, 1931, leaving to survive him a widow, two children, and a grandchild. Under the terms of his will the residue of his estate was left in trust, one half of the net income to be paid to the widow, as long as she remains

his widow, in monthly payments beginning six months after his death. The other one half of the income is to be divided equally between the two children. At the termination of the life estates, the principal is to be distributed to the issue of testator's children, and if no grandchildren should survive then a portion of the principal is bequeathed to certain designated charities, and the balance to be equally divided between the next of kin of decedent and his wife.

The Northwestern Trust Company, which was designated as trustee in the will, was in liquidation at the time of decedent's death. Subsequently, on December 12, 1934, the Provident Trust Company was appointed substituted trustee on the petition of the life tenants. In 1936, the substituted trustee and the life tenants learned for the first time that decedent at the time of his death had been the owner of various parcels of real estate.

Included in this real estate was a plot of unimproved ground, producing no income, located on Washington Lane, Philadelphia. A sale of this ground was effected on March 2, 1937, for the sum of $70,000 at which time unpaid taxes for the years 1932 to 1937, inclusive, were paid. In addition to the Washington Lane property, the trust estate also included other unproductive real estate, which has not yet been sold. The substituted trustee has paid taxes and other carrying charges on this real estate in a sum approximately $2,000 in excess of the income received from it. The taxes on the Washington Lane property, as well as the charges on the other real estate, have been charged against the income of said trust in the trustee's account.

There are no disputes as to the facts in this case, which are all set forth in a stipulation agreed to by the parties in interest. At the audit the life tenants claimed a portion of the proceeds of the sale of the Washington Lane property under the rule stated in section 241 of the A. L. I. Restatement of Trusts. The guardian and trustee ad litem appointed by the court at the time of the

audit agreed that the apportionment be made between life tenants and remaindermen as requested, and the auditing judge awarded the apportionment in accordance with the agreement of the parties. A further request was made by the life tenants that the taxes on the Washington Lane property, which accrued during the period from the date of decedent's death to the time of the sale, be charged against principal instead of income. This was opposed by the guardian ad litem, but the auditing judge concluded that the burden of the taxes should be borne by principal. A similar request for placing the burden of the taxes and other carrying charges on the unsold land was made, and the auditing judge ruled that these charges should be borne by principal and regarded as an advance.

The guardian ad litem filed exceptions, which, although not strictly in accordance with our practice (see Henderson's Estate, 29 D. & C. 1 (1937)), nevertheless place before the court objections to (1) the apportionment of the sale price of the Washington Lane property between income and principal; (2) the allocation of the taxes on this property to principal; and (3) the allocation of the taxes and carrying charges on the other real estate to principal. We will discuss these questions seriatim.

1. *The apportionment of the proceeds of the sale of the Washington Lane property between life tenants and remaindermen.*

The apportionment of the proceeds of the sale of this unproductive piece of ground, which was owned by decedent at the time of his death, was suggested in conformance with section 241 of the A. L. I. Restatement of Trusts, which is set forth in the adjudication. As stated before, the guardian and trustee ad litem at the audit agreed that this apportionment should be made as requested by the life tenants. The auditing judge followed the recommendation of the guardian ad litem, because he stated that he was convinced that the position taken was correct. However, in a letter written to the auditing

judge, after the audit, and by his exceptions, the guardian has reversed his position. In our opinion this is not only clearly within his rights but his absolute duty. It was manifestly a mistake for him to have agreed to the apportionment requested by the life tenant. It was his duty, as an appointee of this court representing persons who cannot speak for themselves because of disability, to defend vigorously every legal right which they possessed. He has no authority to surrender without consideration any right or property which is theirs regardless of his natural sympathy for decedent's widow.

The auditing judge in the adjudication states that this is the first time that such a claim for apportionment has been made so far as he is aware, except in Ferree's Estate, October term, 1928, no. 3045, in which Judge Sinkler refused to accept the doctrine enunciated in section 241 of the Restatement. In our opinion, Judge Sinkler was clearly correct.

We have made a careful and exhaustive study of all the reported cases on this subject in this State and have been unable to find any decision which supports the conclusion of the auditing judge. On the contrary, it appears that our courts have always held that any enhancement in the value of unproductive real estate held in trust and owned by decedent at the time of his death belongs to principal. In Hubleys' Estate, 16 Phila. 327 (1884) (affirmed by the Supreme Court, January term, 1884, no. 355), Judge Penrose said (p. 330) :

"A rise in the value of trust investments, like a rise in the value of lands held in trust has always been regarded as an accretion of the principal, and, therefore, belonging to the remainderman (see *Schofield vs. Mackinlay*, 32 L. J. Ch. 627) ; just as depreciation would fall upon him and not upon the tenant for life."

See also Conner's Estate, 239 Pa. 449 (1913), in which the Supreme Court affirmed, per curiam, the decision of this court on the opinion of Judge Gest, who said at page 451:

"This sale was not in effect different from any sale by a trustee of unoccupied or idle property, and it has never been claimed that upon such sale being made the life tenant could demand a portion of the price to compensate him for the income which he had failed to receive."

So much has been written concerning the Pennsylvania doctrine of equitable apportionment between life tenant and remainderman that it would be surplusage for us to repeat here what has been said so many times in the decisions on this subject. A most illuminating and scholarly discussion of the development of this doctrine and the theory upon which it is based can be found in the dissenting opinion of Stearne, J., in Levy's Estate, 34 D. & C. 312 (1938), confirmed by the Supreme Court in 333 Pa. 440 (1939). Judge Stearne said (p. 319) :

"From Earp's Appeal, 28 Pa. 368, the life tenant was properly decreed to be entitled to all the income from the trust estate. Under the highly-developed financial corporate structures of today, income which is justly due the life tenant frequently is concealed, remains undisclosed or is not readily apparent. The existence of such income was often overlooked in sales of the stock where accumulated income in surplus enhanced the sale price; where extraordinary stock and cash dividends were paid, and in numerous other situations appearing in the reported cases. In strictly enforcing testator's intention that the life tenant, the primary object of his bounty, should receive what was in fact given to him, the modern application of this doctrine has been carried to a most scientific and accurate conclusion. The whole inquiry, however, is what is income and what is principal. With the same fine scale of justice, corpus is preserved for the remainderman. Under no guise is corpus ever depleted merely to aid necessitous life tenants."

Counsel for the life tenants in their brief rely heavily upon the fact that section 241 of the Restatement has been adopted in New York and Massachusetts. In our opinion this is of little consequence in the present case.

In Nirdlinger's Estate, 290 Pa. 457 (1927), Mr. Justice Kephart points out that the courts of Pennsylvania have differed from those States in the past in respect to apportionment problems, and it appears that we must also go our separate ways with respect to the question under discussion. We will repeat what Judge Sinkler has so well said in Ferree's Estate, supra:

"It would be a departure from established rules of property in this Commonwealth to pay 'income' to life tenants where property has produced no income. The direction of a testator that 'net income' be paid to life tenants cannot have reference to the corpus of an estate, which is expressly given to the remaindermen."

It is, of course, true that long delays in the sale of such unproductive real estate would result in hardship to the life tenants who might be deprived of all income for a long period of time. In such cases, however, their remedy appears to be to petition the court for an order upon the trustees to sell the land. We do not believe it to be within our province to change the rules of property which have been so firmly entrenched in our law. If such a change is to be made, it must originate in the legislature or be first enunciated by the Supreme Court.

But even if the rule of section 241 were followed, its application to the present case would be doubtful. The rule refers specifically to "property which the trustee is under duty to sell." It does not appear that the trustee in the present case was under any duty to sell, as the will specifically provides that it shall have the power to retain any investment that decedent might leave so long as it might deem it advisable to do so.

Moreover, the formula adopted by the auditing judge, allowing income to the widow from the date of decedent's death, is clearly contrary to the terms of the will, which provides that the payments to her should begin six months after his decease. However, since a majority of the court is of the opinion that the rule of section 241 of the Re-

statement of Trusts should be rejected, this discussion becomes moot. Exception 2 is therefore sustained.

2. *The allocation to principal of taxes on the Washington Lane property.*

In following section 241 of the Restatement and apportioning the proceeds of the sale of this property between life tenants and remaindermen, the auditing judge ruled that the carrying charges must first be deducted from the sale price and the net balance apportioned. Although we agree with the auditing judge that the taxes in question should be charged to principal, we are of opinion that the reasons he assigns therefor are not in accordance with the Pennsylvania rule. In Levy's Estate, 333 Pa. 440 (1939), the Supreme Court in an opinion by Mr. Justice Schaffer decided that the question of the apportionment of carrying charges on unproductive decedent-owned real estate must be determined in each case by the equities between life tenants and remaindermen, and held that the determination of this question is for the court of first instance in the exercise of its sound discretion. It would therefore be necessary for us in the ordinary case to refer the matter back to the auditing judge for such an equitable determination. However, since there is no dispute as to any of the facts, which are all set forth in the stipulation annexed to the record, we believe that such action is unnecessary in the present case and that we can properly pass upon this question.

The factual situation existing here is most unusual. Neither the trustee nor the life tenants knew of the ownership of this land by the decedent for a period of almost five years following his death. When the facts were discovered, the substituted trustee moved promptly to effect a sale at what appears to have been a most advantageous price. It is obvious that the delay was to the advantage of the remaindermen, because the price obtained for the land is far in excess of what is agreed by all parties in interest to have been its fair value at the time of dece-

dent's death.  Under these circumstances, it would be highly inequitable to place the burden of the taxes on the life tenants when they received no income of any kind from the land prior to its sale.  We are, therefore, of the opinion that the equities of the situation require us to charge the taxes, accrued against the property from the date of decedent's death to the date of the sale, against principal.  We see no merit in the argument of the guardian ad litem that, under the language of this will, taxes on all real estate, both productive and unproductive, must be paid out of income.  Exceptions 3, 4, and 5 are therefore dismissed.

### 3. *The allocation to principal of taxes and carrying charges on the unsold real estate.*

In addition to the Washington Lane property, decedent owned other unproductive real estate, which has not yet been sold.  The auditing judge ruled that the sums paid for taxes and carrying charges on this real estate should be charged to principal as an advance.  In our opinion this was a proper conclusion under the circumstances of this case.  In Levy's Estate, supra, a similar situation was involved.  Only a portion of the real estate owned by decedent was sold in that case and, on appeal, the Supreme Court made no distinction in its discussion of the apportionment of the taxes between that portion of the land which had been sold and that which remained unsold.  We believe that in every situation where the question of the allocation of carrying charges of decedent-owned, unproductive real estate arises, the problem resolves itself into an application of the sound discretion of the court of first instance.  If the land is actually sold, the allocation made by the court becomes final.  If the land is unsold, the allocation is merely a temporary expedient and must be regarded as an advance by principal.  At the time of the sale of this remaining real estate the court will be required to make a final determination of the manner in which the taxes should be allocated after careful study of

all the circumstances. Unless this rule includes problems involving unsold real estate, it may be rendered completely ineffective. The real estate may not be sold for a long period of time, during which the life tenants, usually the favored objects of testator's bounty, might be completely deprived of all income. In Nirdlinger's Estate, 331 Pa. 135 (1938), the court said:

"The carrying charges on unproductive property can be advanced out of principal. These advancements can be recouped when the properties are sold. The worst that could happen to the corpus would be that the property, when sold, would not bring enough to cover the advancements. This we think most unlikely. The property itself in the hands of the trustees is security to them for advances made."

It is true that in Levy's Estate Mr. Justice Schaffer said (p. 442), referring to Nirdlinger's Estate from which we have just quoted, that what was said in that case was limited in its application to the salvage of collateral, and was not meant to apply to a situation involving decedent-owned real estate. Yet we believe that this quotation can be applied with equal force to the instant case. To hold otherwise might result in the sacrifice and loss of the real estate for unpaid taxes and other carrying charges, which would completely wipe out the interest of both the life tenants and the remaindermen.

It seems clear to us that under the circumstances of this case, in which the account discloses that the life tenants have received no income since the date of decedent's death in 1931, fairness and equity require that the taxes and other carrying charges be temporarily charged to principal. Exceptions 6 and 7 are therefore dismissed.

The amount of the fee to be allowed the guardian and trustee ad litem for his services was not fixed in the adjudication but deferred pending the argument on the exceptions. Since that time the parties in interest, with the approval of the auditing judge, have agreed that this fee should be allowed in the sum of $300, and it is so awarded.

The adjudication, as modified by this opinion, is confirmed absolutely.

VAN DUSEN, P. J., dissenting. — I dissent from the judgment of the court sustaining exception no. 2 for the reasons given in my adjudication.