CHARLES W. HEYN ET AL. *v.* FIDELITY TRUST COMPANY ET AL.

[No. 92, October Term, 1937.]

*Decided February 9th, 1938.*

*Decision on reargument July 19th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ., and subsequently reargued.

*William L. Marbury, Jr.,* and *Jesse Slingluff, Jr.,* with whom were *Marbury, Gosnell, & Williams* on the brief, for the appellants.

*Clarence A. Tucker* and *Biscoe L. Gray,* with whom were *Knapp, Tucker, & Thomas* on the brief, for the appellees.

SHEHAN, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court of Baltimore City, directing how certain dividends, paid to the executors and trustees of the estate of Edward C. Heyn on securities and stocks forming a part of the estate, and owned by the testator at the time of his death, on July 28th, 1936, should be distributed or allocated to corpus and income.

The suit involves the construction of the Act of the General Assembly of Maryland of 1929, chapter 495, and codified in section 305C of article 93 of the Supplement to the Code of Public General Laws, 1935, which is as follows: "305C. All rents, annuities, dividends and periodical payments in the nature of income, payable under the provisions of any will, deed or other instrument executed after the first day of July, 1929, shall, like interest on money lent, be considered as accruing from day to day, and shall be apportionable in respect

of time accordingly, unless otherwise expressly stated by the instrument under which they are payable; but no action shall be brought therefor until the expiration of the period for which the apportionment is made."

Edward C. Heyn, by his will, after some formal directions, and certain specific legacies, devised the rest of his estate to the Fidelity Trust Company and Robert E. Heyn, as trustees, for his four children. The Fidelity Trust Company and Robert E. Heyn were named as executors in the will. In the trust estate there were securities and shares of stock, the allocation of the dividends from which, between corpus and income, is the subject-matter in controversy in this suit. The stockholders, under the charters of these companies, are entitled to dividends, but only when and as declared by the boards of directors of the respective companies, and this immediately brings us to the question whether the date of the declaration of the dividend or the record date of the holding of the stock should be taken in the apportionment or allocation of the dividends to corpus or income. This question was decided in *Zell v. Safe Deposit & Trust Co.*, 173 Md. 518, 196 A. 298. It was there held that the date of the declaration should be the controlling date with respect to the allocation to corpus or income.

In further considering the questions here presented, the appellants divide these stocks, for convenience, as did the chancellor, in his opinion, into certain classifications with respect to the character and kind of stock and the nature of the dividends declared, and this division was substantially followed by the appellees in their argument, and, for convenience, we will make the same division herein, although not in the same order.

First, testator held, prior to his death, shares of common stock, on which irregular dividends had been paid for a considerable period of time prior to his death and on which a dividend, since that time, has been declared and paid. Under this division the deceased held common stock in the United Corporation and, after his death, a

dividend of twenty cents was declared, payable on December 18th, 1936.

Second, common stock on which dividends have been paid at regular intervals, both before and after the death of the testator. On shares of American Gas & Electric Company, North American Company, E. I. duPont de-Nemours & Co., Mid-Continent Petroleum Company, and Commercial Credit Company, regular dividends were paid at regular periods, both before and after the death of the testator.

Third, shares of stock on which no dividends have been paid since the death of the testator. This applies to the Allegheny Corporation, Maryland Casualty Company, Manufacturers Finance Company, Baltimore Transit Company, and B. V. D., Inc.

Fourth, cumulative preferred stock, on which no dividends had been paid for a time prior to the testator's death, but on which one or more dividends have been paid thereafter. Under this division there was held 6½ preferred stock of B. V. D., Inc., the Delaware corporation. There seem to have been no earnings on these shares of stock, but there was a paid in capital surplus, and, out of this, a quarterly dividend was paid for the first quarter of 1923, and thereafter no dividend was paid until December 21st, 1936. The resolution of the board of directors, authorizing this dividend, provided that the dividends so paid should be for the period commencing December 31st, 1931, and ending November 30th, 1932. It is claimed that the operation of this company had always shown a net loss, although the capital surplus was sufficient for the purpose.

Fifth, shares of cumulative and noncumulative preferred stock, upon which full dividends have been paid at regular periods, both before and after the death of the testator. Under this classification, the testator held preferred stock of the General Motors Corporation, American Smelting & Refining Company, Consolidated Gas Company, and others. Some of these stocks are cumulative and others noncumulative, but it appears that

full, regular, quarterly dividends have been paid thereon, both before and after the death of the testator.

Sixth, preferred stock on which no dividends have been paid since the death of the testator. Here there were shares of cumulative second preferred stock of the Manufacturers Finance Company, on which no dividends have been paid since the death of the testator. No other history of this company's earnings and dividends seems to appear in the record with respect to these shares.

Considering these classes of stocks, and dividends thereon, in the order above designated, it is apparent that the facts with respect to the first classification raise the same question as is presented in the case of *Zell v. Safe Deposit & Trust Co., Executor, supra.* When Edward C. Heyn died, he left, among other securities, shares of stock in the United Corporation on which no dividends had been declared for several years prior to his death. After his death, a dividend was declared, payable on December 18th, 1936. The chancellor ruled, adhering to the decision of the lower court in the *Zell* case, that there should be an apportionment as to this dividend, and it should be made on a basis of the number of days between the date of the last dividend prior to the testator's death and the date of this dividend. The portion of the period prior to his death should determine the amount payable to corpus, and the portion of the period subsequent to his death should determine the amount of income. Thus the Act of 1929, ch. 495, *supra,* was construed. It is our opinion that the chancellor erred, for the reasons stated by this court in the *Zell* case, and which need not be here repeated, and this dividend was entirely income.

The contention of the appellant, that apportionment between corpus and income should be based on the dividend period fixed by the charter or by the customary practice of the corporation, and not the period beginning with the record date of the last dividend prior to the death of the testator, is sound in principle. What we have said applies generally to dividends on preferred

stock and on cumulative preferred stock. All are included in the broad language of the act, "all * * * dividends and periodical payments in the nature of income." They do not accrue until declared, as is the case with the dividends on common stock. The rule is well stated in the English case, by Sterndale, M. R., *In re Wakley,* 2 Ch. 205, as follows: " * * * In respect of the time with reference to which dividends are paid, there is no difference between a cumulative preference and an ordinary dividend. Each is a dividend for the year or other financial period of payment: that the preferred dividend is preferential, fixed, and cumulative means only this, that these are the factors by which the priority and the amount of the share of the dividend fund appertaining to the preference shareholder are ascertained."

And a similar analysis was made in *Crozer's Estate,* 27 Pa. Dist. & County Rep. 179. The classes of stock here involved are common, preferred, and cumulative preferred stock. In none of these classes, under the facts here presented, does there seem to be any reason for a distinction in regard to the allocation of dividends. There is no special provision in the instrument, or in the charter under which they are declared, nor any extraordinary conditions relating to the dividend, as in *Thomas v. Gregg,* 78 Md. 545, 28 A. 565. See also, *Baldwin v. Baldwin,* 159 Md. 175, 150 A. 232, and *Spedden v. Norton,* 159 Md. 101, 150 A. 15, and *Ex Parte Humbird,* 114 Md. 627, 629, 80 A. 209. The mere classification of stock does not warrant a construction or inference to the contrary. Preferred stock ordinarily yields income with certain preferences over common stock, and cumulative stock has advantage with respect to both common and preferred stock, but these are only incidents relating to their classification, and have no special significance, when considering only their dividends, in the application of the rule prescribed in the Act of Assembly under consideration. A dividend on preferred stock, as on common stock, does not become due and payable until it is declared, and no obligation is created until such action

of the proper officers of the corporation is taken. With respect to cumulative preferred stock, the accumulations over the periods are preserved and paid out to stockholders in preference to common and preferred stock, but these are all income within the meaning of the statute and are intended to be treated the same in their allocation to corpus or income. We are primarily dealing with allocations of dividends with respect to income and corpus, and the statute provides that "all dividends" are included, and not with the respective preferences of the holders of classes of stock that the corporation has seen fit to create. In *Crozer's Estate, supra,* the statement is made, with supporting authority, that: "The fact that the dividend is paid on preferred stock makes no difference in the application of the rules, so long as the transaction was in good faith with no intent to take advantage of the owner in remainder." And further, that: "If dividends on cumulative preferred shares have not been paid for some time prior to the creation of the trust and are subsequently declared and paid during the period of the trust, whether or not out of earnings accruing prior to the creation of the trust, the dividends so paid are income."

With these principles in view we approach the second classification above made. Here there had been regular dividends both before and after the death of the testator, and it is obvious that such as were declared before his death should be allocated to corpus and such as were declared for the period after his death should go to income, and such dividends as were declared for a period beginning before his death and ending after death should be considered like interest accruing from day to day, and so apportioned over the period.

With respect to the third classification, no dividends have been declared since the death of the testator, and therefore there is no question presented here for our consideration, because such dividends as may have been declared prior to his death obviously belong to corpus.

The fourth classification presents some difficulty. The

lack of earnings, the presence of a paid-in capital surplus and the statement in the dividend declaration to the effect that the dividends so declared should be for the period commencing December 31st, 1931, and ending November 30th, 1932, establishes a definite period. This period began and ended before the death of the testator, and if there was nothing more, and if we are to regard the statute in this respect as meaning literally what it says, and the declaration of the dividend as meaning what it says, then it follows that this must be regarded as income within the meaning of the statute. On the other hand, this payment is out of paid in capital surplus and not out of earnings, and is therefore a distribution of capital, in the nature of a liquidation dividend, and it is contended that the statute refers not to capital, but to income from capital, and the surplus capital, through the increase in the value of the stock, augments the estate, and this dividend merely takes out of the corpus something that belonged to the deceased at the time of his death, and to that extent lessens the value of his estate as it existed at that time, and should, therefore, belong to his estate as corpus after his death. This seems to be the correct view. It cannot be regarded as a periodical payment in the nature of income, and, as interest accruing from day to day, therefore this entire amount should be regarded as corpus, and no part thereof as income. *Thomas v. Gregg*, 78 Md. 545, 28 A. 565; *Zell v. Safe Deposit & Trust Co.*, *supra*. In *Ex Parte Humbird*, 114 Md. 627, 629, 80 A. 209, 212, this court said: "The origin and character of the fund out of which the dividend is paid is the controlling subject of inquiry. If it is found to represent earnings, it will be held to be income; but, if it is an appropriation of capital, it belongs to the corpus."

The Supreme Court of Pennsylvania, in *Re Opperman's Estate*, 319 Pa. 455, 179 A. 729, 732, said: "We find that dividends were declared and paid from a surplus brought about by a reduction in capital stock. The distribution of this fund to shareholders by dividend

was a return of contributed capital by corporate action. It was an unusual circumstance, and having been paid as a dividend its allocation to corpus was beyond question."

In the fifth classification, shares of cumulative and noncumulative preferred stock were held, upon which regular quarterly dividends were paid at periods both before and after the death of the testator. There seems to be no question in this classification. The dividends paid before the death of the testator became a part of his estate and were, therefore, corpus. Dividends for the current period in which his death occurred should be allocated, under the statute, to corpus and income, and dividends paid for a period beginning and ending after his death should be regarded entirely as income.

The sixth classification presents no question for our consideration. There were shares held by the testator of cumulative second preferred stock, on which no dividends had been paid since the death of the testator, and no history of the company's earnings or dividends appears in the record. We are, therefore, not called upon to pass upon any question in relation thereto.

It should be stated, with regard to these several classes of stock, that there is no relation of debtor and creditor between the corporation and preferred stockholders or cumulative preferred stockholders until the declaration of the dividend, when, in consequence of the declaration, the obligation of debtor and creditor does arise. This question has been well considered in *Crozer's Estate, supra;* and in *Mitchell v. Liberty Clay Products,* 291 Pa. 282, 139 A. 853, 855, it was said: "Preferred stockholders are members of the corporation, not its creditors. 'Formerly it was a matter of doubt and discussion whether or not a preferred stockholder had any rights as a creditor of the company or was confined to his rights as a stockholder. The law is now clearly settled that a preferred stockholder is not a corporate creditor.' "

It must, therefore, follow that the relation of debtor and creditor does not arise between the corporation and

a stockholder of any of these classes until the dividend has been declared.

Having fully expressed our views with regard to the many problems presented on this appeal, the decree will be reversed in part and affirmed in part, as above indicated, and the case will be remanded for the passage of a decree in conformity with the views herein expressed.

*Decree affirmed in part and reversed in part, and case remanded for the purpose of a decree in conformity herewith; costs to be paid by the appellees.*

OFFUTT, J., delivered for the Court the following additional opinion, after reargument.

Reconsideration of the conclusion announced in this case, *Heyn v. Fidelity Trust Company*, that a cash dividend declared subsequent to the death of the testator on the cumulative preferred 6½ percent stock of B. V. D., Inc., was in the nature of a liquidating dividend and a distribution of capital rather than of earnings, requires a more elaborate statement of the factual background on which the conclusion rested than is found there.

Edmund C. Heyn died on July 28th, 1936, leaving a will dated January 8th, 1930, in which he bequeathed to the Fidelity Trust Company the residuum of his estate in trust, to pay the income therefrom (1) to the education, maintenance and support of his four children, until respectively they reach the age of twenty-one years (2) thereafter to pay to "such child" if male, the income from one-half of his share until he arrives at the age of thirty years, then to distribute to him one-half of his share absolutely, (3) to pay to him the income on the remaining half until he reaches the age of thirty-five years, and then to distribute to him that half absolutely, (4) in the case of the daughters to pay to éach for her life the income from her share. Each child is given the power to dispose of his or her share by will, but failing such disposition the share given to each child is to go

to his or her descendants, and failing descendants to the survivors of the four children and their descendants per stirpes.

The executors of the will in their distribution account distributed in kind to the trustee as a part of the share of each child 171 shares of cumulative preferred 6½ per cent stock of B. V. D., Inc., six shares cumulative preferred 7 per cent stock of the United States Steel Corporation, and eight shares cumulative preferred 7 per cent stock of Manufacturers Finance Company, which the testator owned at his death.

Dividends on the preferred stock of B. V. D., Inc., were paid for the first quarter of 1932 and thereafter passed until December 14th, 1936, when a dividend of $6.50 per share was declared "for the period commencing December 1st, 1931, and ending November 30th, 1932," payable December 21st, 1936, to stockholders of record at the close of business on December 18th, 1936. Another dividend of $6.50 on each of such shares was declared after the distribution account was filed, payable August 21st, 1937.

The United States Steel Corporation paid a dividend on its preferred stock on November 29th, 1935, of fifty cents per share, at which time dividends, which if declared would have aggregated $15.00 per share, remained unpaid. On August 1st, 1936, it paid a dividend of $1.00 per share on account of such dividends, on November 2nd, 1936, its regular dividend of $1.75 per share and $2.00 per share on passed dividends, on December 1st, 1936, a dividend of $7.00 per share on passed dividends, and on January 30th, 1937, a dividend of $1.75 per share on passed dividends.

A dividend on the preferred stock of the Manufacturers Finance Company was paid on July 13th, 1936, and after the death of the testator other dividends were paid, the aggregate of such payments, however, being less than the aggregate of payments of dividends on preferred stock at its regular rate would have been if they had been declared.

B. V. D., Inc., is a holding company, which upon its organization in 1929 acquired the securities and stock of certain subsidiary corporations. The value of the property of the subsidiary companies fixed by an appraisal for the consolidation exceeded the par value of the common and preferred stock of B. V. D., Inc., and that excess was carried by it as a "paid-in capital surplus," and "actually came from the earned surplus eventually of the constituent companies."

The history of its operations is indicated in this table:

| "Year Ended | Operating Profit | Loss | Dividends Accrued | Cumulative Accrued Dividends |
|---|---|---|---|---|
| 8/31/30 | 28,502.09 | | | |
| 8/31/31 | | 477,961.24 | | |
| 8/31/32 | | 985,729.30 | 253,968.00 | 253,968.00 |
| 8/31/33 | 382,538.16 | | 201,680.37 | 455,648.37 |
| 8/31/34 | 349,512.76 | | 260,370.51 | 716,018.88 |
| 8/31/35 | | 36,126.22 | 260,370.50 | 976,389.38 |
| 8/31/36 | 468,006.32 | | 260,370.50 | 1,236,759.88" |

In the fiscal year ending August 31st, 1930, dividends in the amount of $218,332.29 were paid, in the year ending August 31st, 1931, dividends in the amount of $338,972.30, and in the year ending August 31st, 1932, dividends in the amount of $84,630.00. In August, 1937, a further dividend of $6.50 per share on its preferred stock was declared for the period commencing December 1st, 1932, and ending November 30th, 1933, and paid from net profits realized in the preceding fiscal year.

The company's charter provided for an issue of 75,000 shares of cumulative preferred 6½ per cent stock having a par value of $100 per share and 50,000 shares of common stock having no par value. That capitalization was subsequently reduced to 50,000 shares of preferred and 25,000 shares of common stock. Its charter provided that dividends not exceeding 6½ per cent on its preferred stock might, in the absolute discretion of its directors, be declared from the net profits of the corporation, payable, if declared, on the first day of June, September, December and March, should be paid before

any dividends were paid on the common stock, and that such dividends on the preferred stock should be cumulative, and that accumulations of undeclared and unpaid dividends on preferred stock should be paid before any dividends were paid on the common stock.

The table shown above indicates that for the period beginning August 8th, 1930, and ending August 31st, 1936, the corporation earned in profits $1,228,559.33, and lost $1,499,816.76, that is, over that period it lost $271,-257.43 more than it earned. In the same period, but including the dividend declared in December, 1936, it paid in dividends on its preferred stock $902,305.09, so that its net loss over the period of $271,257.43, and the aggregate amount of the dividends paid, must have come from surplus accumulated before the trust.

It appears to be conceded that the United States Steel Corporation for some time prior to the testator's death and since then earned net profits sufficient to have paid current dividends on its preferred stock, and that its surplus earnings accumulated at the testator's death were sufficient, or nearly so, to have covered its payments on account of passed dividends.

There is nothing in the record to indicate the source of the dividends paid since the testator's death on the preferred stock of the Manufacturers Finance Company, although it does appear that when such dividends were paid earlier dividends had been passed.

Out of these facts several questions arise: One, does Code, art. 93, sec. 305C (Acts of 1929, ch. 495) known as the Apportionment Act, control the apportionment of dividends, declared after the death of the testator, on the cumulative preferred stock of the three companies above described? Two, are such dividends allocable to corpus, to income, or ratably to each (a) if the act does apply, (b) if it does not apply? Three, if such dividends may be apportioned, what must be the basis of the apportionment?

The statute provides: "All rents, annuities, dividends and periodical payments in the nature of income, payable

under the provisions of any will, deed or other instrument executed after the first day of July, 1929, shall, like interest on money lent, be considered as accruing from day to day, and shall be apportionable in respect of time accordingly, unless otherwise expressly stated by the instrument under which they are payable; but no action shall be brought therefor until the expiration of the period for which the apportionment is made." Code, art. 93 (1935 Supp.) 305C.

The chief difficulty in applying that language literally to dividends declared after the death of the holder on stock given by him in trust for successive beneficiaries lies in the irreconcilable difference between dividends and such income as rents and annuities. Rents and annuities are payable ordinarily under the terms of some contract which at once establishes a contractual relation between the parties, under which, while the sums to be paid thereunder may not become payable and due until the occurrence of a predetermined date, they must inevitably eventually become payable, and because of the fixed and certain character both of the payments and of the time when they must be made they may be readily and precisely apportioned.

Dividends on the other hand do not accrue, or become due or payable, until declared (13 *Am. Jur., Corporations,* sec. 683), and until declared no relation of debtor and creditor arises between the stockholder and the corporation in respect to them (*Ibid*), for until declared they do not exist. Now the words "dividends and periodical payments," used in the English Apportionment Act, apparently refer to dividends which are paid at regular intervals or periods, because the word "other" also qualifies "rents and annuities" which are commonly so paid. The question is whether a dividend becomes due and payable upon the incidence of such a period or date when no dividend has been declared.

The Maryland Apportionment Act is substantially identical with the second section of the English Apportionment Act of 1870, omitting the section of that Act

which defines "dividends." But in respect to the second section of the English Act Jessel, M. R., a very sound lawyer, in *Carr v. Griffith*, 12 Ch. 661, said that if the Act had stopped with that section it might well have meant dividends payable periodically. But, applying the definition, he decided that under the statute dividends whether paid at fixed times or otherwise were apportionable. It is true that the facts of that case were peculiar and that what was called stock partook more of the nature of a debenture, and that what was called a dividend was more in the nature of interest at a fixed rate, because it was payable quinquennially at the rate of five per cent on the amount paid up on the shares, out of earnings or capital.

In *Re Sale* [1913] 2 Ch. 697, a testatrix died in September, 1909, leaving a will in which she bequeathed in trust for a life tenant 375 five per cent cumulative preferred shares of a certain corporation. A dividend of two per cent on that stock was declared for the year ending January 31st, 1909. Thereafter no further dividends were declared until the so called "arrearages" amounted to two hundred and fifty pounds, and in that period of accumulation the corporation had set up a large sinking fund. The life tenant died in 1912, and at her death her executors claimed that they were entitled to those arrearages out of any future preferential dividends. In deciding that question it was said that *In re Griffith, supra,* merely decided that a quinquennial bonus fell within the description of a dividend defined in the Apportionment Act of 1870, section 5, and that "The resolution creating the cumulative preference shares is in common form and the articles provide for the declaration of dividends in the usual way out of profits and for the creation of a reserve fund at the directors' discretion. * * * The life tenant had no right to a fixed dividend charged on profits in any event. She had merely a right to a preferential dividend as and when the directors of the company chose to declare it, and no dividend for any part of the life tenancy period was in fact earned or

declared. The remaindermen also relied on *In re Armitage* [1893] 3 Ch. 337, where Lindley, L. J., said: 'What does a man mean when he leaves shares to a tenant for life? He means that that tenant for life shall have the income arising from the shares in the shape of dividends or bonuses declared during the lifetime of the tenant for life. He does not mean that the tenant for life shall receive profits in any other sense.' That passage is applicable to the present case. On the true construction of the will the testatrix in my judgment intended that on the life tenant's death the shares and all dividends declared for periods subsequent to that date should belong to the remaindermen absolutely."

In *Re Taylor's Trusts* [1905] 1 Ch. 734, it appeared that by an indenture of settlement certain funds were settled upon trusts in favor of a Miss Hilda Nora Grace Matheson in contemplation of her marriage, that the schedule included certain bond certificates, part of an issue secured by a second mortgage on the property of a Mexican railroad company, containing a promise to pay interest at six per cent when and as earned, the payments to be cumulative but to be payable only from net profits remaining after payment of interest on the obligor's first mortgage bonds. Some of the bonds were sold from time to time, and eventually those that remained were sold for twenty-seven hundred pounds, and at the time they were sold there was a substantial amount of interest in arrears and unpaid on them. After the sale Miss Matheson, who had married, died, and the question arose as to whether her executor was entitled to any part of the twenty-seven hundred pounds. Denying any such right the court said:

"It all turns on this—that there is no obligation in this instrument to pay interest in any event; there is only an obligation to pay interest out of a fund, and there is no obligation to pay until there is such a fund; and if there be not such a fund during the existence of the tenancy for life, then the tenant for life, as it appears to me, is not entitled to any interest.

"Under those circumstances, it seems to me, the tenancy for life, which came to an end on May 22, 1902, down to which date there was no fund, is not entitled to anything in respect of income.

"Therefore, the sum which has been received for purchase-money is not apportionable."

In *Re Wakley* [1920] 2 Ch. 205, the question was whether the Apportionment Act applied to dividends, paid upon shares held by the testator, declared after his death in a resolution allocating them to a period in the testator's life time when no dividends were declared or paid. The stock was cumulative and preferred, but no dividends were payable thereon except from profits. Holding that the Act did not apply, Lord Sterndale, M. R. said: "If the declaration be, as I think it is and must be, in respect of the year in which divisible profits exist, the Apportionment Act does not apply to the dividends so declared. I ought to notice the argument placed upon the word 'arrears.' It is a convenient expression, and is often used in cases of this description, but it cannot be taken as meaning arrears in the strict sense of the word, which I take to be sums of money in respect of which the date of payment has passed, for, as I have already pointed out, no dividends were due or payable in the earlier year, because the conditions essential to payment had not been performed. So far I have dealt with the matter apart from authority, but there is authority in favor of the view which I have expressed." And to the same point Lord Justice Warrington: "It follows that when profits are available and the company determines to distribute them, it is the shareholder who is then entitled to the shares who takes the dividend, and not the person entitled to them in past years, though the dividend may in the case of cumulative dividend be large enough to cover the amount which would have been paid in past years if there had been profits available, but which was not paid because there were no such profits."

See also *Marjoribands v. Dansey* [1923] 2 Ch. 307, and *In re Sandback* [1933] Ch. Div. 505.

It is a sound and a familiar principle of statutory construction that the meaning given to a statute by courts of the jurisdiction in which it was first enacted should be given great weight, and where they are consistent with reason and sound logic may be accepted as controlling. *Lavender v. Rosenheim,* 110 Md. 150, 156, 72 A. 669; *Zell v. Safe Deposit & Trust Co.,* 173 Md. 518, 196 A. 298.

If the reasoning of these cases in respect to the English Apportionment Act is accepted as sound, the Maryland Act would not apply to an irregular dividend such as that under consideration, declared after the death of the donor, settlor, or testator, but only to dividends declarable on stock on which dividends have been paid at fixed intervals, or where the stock is sold during the life of the trust in such a period, or where the holder of a succeeding interest takes in a dividend period on the termination of a preceding interest. In *re Wakley, supra,* 212.

In this case dividends on the cumulative preferred stock were, if payable at all, payable under the company's charter at certain fixed dates regularly recurring. But they were not payable at all until declared, and in fact they were not paid at the specified times but irregularly, nor was the company under any obligation in respect to their payment, other than to pay no dividends on its common stock until it should first have paid all dividends which would, if declared, have been payable in and for past periods. Any different result would require the assumption of a wholly fictitious regularity in the payment of dividends on the stock, when it is undisputed that there was no such regularity.

Assuming that the statute does not apply to such dividends, we are remitted to what may be called the common law for a rule for the determination of the rights of successive beneficiaries to the income from trust funds realized from such dividends as that declared

in December, 1936, on the cumulative preferred stock of the B. V. D. Inc. There are varying views as to what that rule should be, so that what is accepted as just and equitable in one jurisdiction may be regarded as inequitable and unsound in another, so that the rights of beneficiaries seem to depend upon geography rather than logic. It is pointed out in an ably prepared and exhaustive note in 86 University of Pennsylvania Law Review, p. 765, that there are three rules having some support, The Pennsylvania rule, the Massachusetts rule, and the Kentucky rule. But it cannot be said that the courts of any state have been wholly consistent in applying any of these rules. In that state of the law we are constrained to accept that rule which is most nearly in harmony with the past decisions of this court.

In *Thomas v. Gregg*, 78 Md. 545, 28 A. 565, the court, after a careful and extensive examination of the cases, adopted the principles implicit in the Pennsylvania rule as stated in *Earp's Appeal*, 1857, 28 Pa. 368. In *Thomas v. Gregg, supra,* a testator bequeathed in trust for the benefit of his daughters for life, and at their death to their issue, railroad stock upon which after his death a stock dividend was declared out of earnings, part of which had accumulated prior to the testator's death. Following *Earp's Appeal, supra,* the court held that where the dividend was payable out of earnings, whether payable in stock or in cash, it should be distributed to the life tenant or remainderman accordingly as it was paid from the surplus accumulated before or after the testator's death. In the course of the opinion it is said (page 568) : "When it is possible for the court to ascertain to any certainty whether the distribution in the stock dividend includes net earnings, and, if so, what proportion, and also whether such earnings were intended to be made a part of the capital, or merely to be used temporarily, with the intention on the part of the directors of refunding them to the shareholders as income, we think it is the duty of the court to make such investigations and dispose of the stock in an equitable way

between the tenants for life and the remaindermen," and later:—"It is clear that the testator desired his daughters to get the benefit of the income of all his property, and it is equally clear that the company intended to compensate the stockholders for the loss of the income of a definite period, used by them, by declaring a dividend to cover that period, viz. 'the period ending September 30, 1891'." In that case one of the life tenants died leaving, to survive, her sister. The dividend was declared after the death of the testator but during the joint lives of the life tenants. It was held that as between them and the remaindermen it should be apportioned. The stock was bequeathed in trust for the "sole and separate use and benefit" of the daughters rather than the income from the stock.

In *Earp's Appeal, supra,* a testator bequeathed the residue of his estate in trust to collect the rents, income, and interest and pay it in certain proportions for the use of his children. Included in the estate was stock of a manufacturing corporation which had accumulated prior to the testator's death a large surplus, out of which after his death it declared a stock dividend. There it was held that the surplus accumulated during the testator's life was capital and part of the stock itself and belonged to the corpus of the estate, but that so much as accumulated thereafter was income. That result was based in part on the fact that the bequest was not of the stock itself, but of the income therefrom, and in the course of the opinion it was said: "where the profits of a manufacturing or banking corporation have been accumulating for many years, until the market value of the stock is more than double its original price, and the owner dies, directing the 'income' of his estate to be applied to particular objects for limited periods, these extraordinary accumulations are as much a part of his capital as any other portion of his estate, and must, therefore, be regarded as forming a part of the principal from which the future income is to arise."

In *Quinn v. Safe Dep. & Tr. Co.,* 93 Md. 285, 48 A.

835, it was held that an extraordinary dividend declared after the death of a testator on stock which he had bequeathed in trust, out of profits which had accumulated during his life, as a sinking fund, but which through an event happening after his death became available for dividends, belonged to the life tenants.

Comparing these two cases, it is apparent that in *Thomas v. Gregg, supra,* it was held that dividends paid out of earnings accumulated in part prior to the death of the testator but declared after his death were, as between the estate and the life tenants, apportionable, while in *Quinn v. Safe Dep. & Tr. Co., supra,* it was held that a cash dividend, out of funds accumulated before the testator's death, where not declared until after his death, went to the life tenant as income.

In the *Northern Central Dividend Cases,* 126 Md. 16, 94 A. 338, the directors of a railroad company voted an increase of its capital stock in order to pay a stock dividend to its stockholders to reimburse them for their failure to receive dividends out of past earnings, which had been applied to betterment of the company's property rather than to dividends. It was held, as between the life tenant and the remainderman under a trust, the dividend should be treated as income or corpus accordingly as the earnings out of which it was payable accrued before or after the death of the testator. The court, in stating that conclusion, said (page 28):

"Our conclusion, based upon the action of the directors and stockholders of the company, is that the stock dividend of 40 per cent., like the other dividends in the case, is income."

"The next question is: How are these dividends to be apportioned between the life tenants and remaindermen? The rule of apportionment is well established in this state by the cases of *Thomas v. Gregg,* 78 Md. 545, 28 A. 565; *Quinn v. Safe Dep. & Tr. Co.,* 93 Md. 285, 48 A. 835; *Atlantic Coast Line Dividend Cases,* 102 Md. 73, 61 A. 295; *Coudon v. Updegraf,* 117 Md. 71, 83 A. 145; *Ex parte Humbird,* 114 Md. 627, 80 A. 209; and *Foard*

*v. Safe Dep. & Tr. Co.*, 122 Md. 476, 89 A. 724. In *Thomas v. Gregg, supra,* it was held that a stock dividend representing earnings devoted to betterments will be apportioned between life tenants and remaindermen, where earnings accruing during the life estate are included in the income; and in *Quinn v. Safe Dep. & Tr. Co., supra,* it was held that a cash dividend goes to the life tenant without regard to the time when the earnings or income accrued."

In *Ex parte Humbird,* 114 Md. 627, 80 A. 209, it was held that where a life tenant is entitled to the income from the stock of a corporation, and that corporation sells part of its property and distributes the proceeds in cash as a dividend that the dividend is to be treated as corpus.

In *Foard v. Safe Dep. & Tr. Co.,* 122 Md. 476, 89 A. 724, testator bequeathed stock in a corporation in trust for his wife during her life and at her death to his daughter. After his death the corporation declared a dividend of 100 per cent to be paid from the proceeds of the sale of securities in which surplus profits accrued prior to his death had been invested. The question was whether they should be treated as income or corpus. In deciding that the dividend should be treated as corpus, and in stating that conclusion, the court quoted with approval this statement in *Smith's Estate,* 140 Pa. 344, 21 A. 438: "It is well settled in this state that, when the stock of a corporation is by the will of a decedent given in trust, the income thereof for the use of the beneficiary for life, with remainder over, the surplus profits, which have accumulated in the lifetime of the testator but which are not divided until after his death, belong to the corpus of his estate; whilst the dividends of earnings made after his death are income, and payable to the life tenant, no matter whether the dividend be in cash, or scrip, or stock." (Page 725). See also *Coudon v. Updegraf,* 117 Md. 71, 83 A. 145.

In the *Atlantic Coast Line Dividend Cases,* 102 Md. 73, 75, 61 A. 295, the directors of a railroad company

declared an extra stock dividend on stock held by a trustee in trust to pay to a life tenant the rents, issues, income and profits and interest of the property and all increase thereof, with remainder over to others. The resolution declaring the dividends recited that the "surplus net earnings" of the company justified the payment of the dividend, and it appeared that that surplus was earned during the period of the trust. It was held that the dividend was income.

In *Washington County Hospital Assn. v. Hagerstown Trust Co.*, 124 Md. 1, 91 A. 787, it was held that a dividend declared from the proceeds of the sale of corporate property made in the ordinary course of its business, which was to buy and sell such property and distribute the profits as dividends, was income.

In *Miller v. Safe Dep. & Tr. Co.*, 127 Md. 610, 96 A. 766, it was held that the reason for appropriating to the corpus of a trust estate a dividend from profits earned but not distributed during the donor's life did not apply to a dividend based on corporate profits earned during the trust period.

In *Baldwin v. Baldwin*, 159 Md. 175, 150 A. 282, a trustee holding funds for a tenant for life with remainder over bought for the trust estate shares in a bank at $500 per share. At that time the book value of the shares was $389. Later it declared a stock dividend which had the effect of reducing the book value of the shares to $322.50. The award of the entire dividend to the life tenant would have had the effect of lessening the book value of the shares held for the corpus to the extent of $67.50 per share. The question was whether the dividends should be awarded to the life tenant, to corpus, or apportioned. In dealing with that question Judge Urner for the court restated the rule in these words (page 283) : "It is a recognized general rule in this state that the disposition of extraordinary dividends from earnings, whether declared in cash or in stock, will depend upon the time when the funds used for the dividends were accumulated. If they were earned before

the trust began, or before it acquired stock in the corporation, the dividends are held to belong as a whole to the corpus. If the dividend funds were altogether earned after the inception of the trust, or its investment in the stock, then the dividends in their entirety go to the tenant for life. But when the earnings represented by the dividends accrued partly before and partly after the trust or its interest in the stock originated, the dividends are apportioned between the life estate and the remainder according to the ratio of the earnings in the respective periods just indicated." The court also quoted and approved this language from *In re Nirdlinger's Estate*, 290 Pa. 457, 139 A. 200, 56: "Under the Pennsylvania or American rule adopted in most American jurisdictions, the rights of the life tenant and the remainderman to an extraordinary cash or stock dividend declared during the life tenancy are determined by a division of the dividend between the claimants so as to preserve intact the book value of the devised property (the corpus) as it existed at testator's death. This was made clear by the decision in *Earp's Appeal*, 28 Pa. 368, long recognized as a leading authority. The effect of the rule is to give to the life tenant the income which has been earned since the trust came into being, but, at the same time, to preserve the value of the corpus as it was at the date of the death of the testator, or, to use a more convenient term, to preserve the intact value of the estate. This intact value includes the par value of the stock, plus any accumulation of income earned before the death of the testator. *Earp's Appeal, supra.* From it must be substracted capital losses. *In re Dickinson's Estate*, 285 Pa. 449, 132 A. 352."

See also 83 *A. L. R.* 1261; 24 *A. L. R.* 9; 42 *A. L. R.* 448; 50 *A. L. R.* 375; 56 *A. L. R.* 1287; 59 *A. L. R.* 1532; 72 *A. L. R.* 981; *Bogert on Trusts & Trustees*, secs. 841-857, for a discussion of the Pennsylvania rule and cases illustrating its application.

Insofar as any general principle may be deduced from these cases, it is that where, after the beginning of a

trust holding stock for successive beneficiaries, a dividend is declared on that stock, if the dividend is payable from profits accumulated in the trust period, whether payable in cash or in stock, it is income and payable for the use of the life tenant, but if paid from surplus accumulated prior to the trust period from profits, the sale of the company's property (where such sales are not in the ordinary course of its business) or from any other source, and the dividend lessens the book or dollar value which the shares had when the trust began, to the extent necessary to restore that value the dividend is to be treated as capital and paid into the corpus of the trust estate. And that the declaration of the corporation as to whether the dividend represents earnings binds the parties to this case. *Northern Central Dividend Cases, supra.*

Applying these principles to the facts and circumstances affecting the dividends of 1936 on the cumulative preferred stock of the B. V. D. Inc. the conclusion seems inevitable that it must be treated as income and payable to the life tenant. It is at once apparent that from 1930 to the death of the testator, considered as one period, the company operated at a loss. The only dividends paid in that period must therefore have been paid from surplus, and therefore depleted to the extent of such payments the book value of the company's stock. But they were paid to the testator, so that he was compensated for that depletion, for while the stock may have been worth less, he received the equivalent of the depreciation in the cash dividends. But it is conceded that in 1936 the company earned profits sufficient to pay the dividends declared in that year. The directors in their discretion could have carried those profits to surplus, or they could have distributed them, as they did, in the form of a dividend to the stockholders of the company. They were under no obligation in reason, in logic or in law, to starve the present stockholders by depriving them of a legitimate share in the current earnings of the company, in order to increase the book

value of the shares. In such a case the reasoning of Warrington, L. J., in *Re Sale,* quoted above, and this statement from *Atlantic Coast Line Dividend Cases, supra*: "Here there is an express and manifest declaration on the part of the company as to how and in what manner the distributions of the net earnings should be made, and, the company having the power of distributing its profits as dividend or capital, its action therein is binding on all persons interested, and should not be controlled by the courts," apply.

The comptroller of the company wrote that the "dividend paid in December, 1936, might, therefore, be considered as having been paid out of the earnings for the year ended August 31st, 1936," which was obvious enough, since it is undisputed that the earnings for that year far exceeded the amount of the dividend declared. The earnings for the dividend year were more than sufficient to pay it. Whether to retain those earnings to increase the book value of the stock or to distribute it as a dividend to the stockholders, was wholly within the discretion of the directors. They elected to distribute them as a dividend, allocable to the dividend year ending November 30th, 1932, but payable to stockholders of record as of December 18th, 1936. Like facts confronted the court in *Re Wakley, supra,* but there the court decided that it was not within the power of the directors to alter the rights of stockholders by such a declaration, and that seems to be good law. And if, as is the fact, the dividend was declared out of current earnings to stockholders of record on December 18th, 1936, it was income and not corpus. *Northern Central Dividend Cases, supra,* page 29, 94 A. 338.

It does not appear with sufficient certainty that the earnings of 1937 were sufficient to pay the dividend declared for that year. If they were, for the reasons stated, the dividend should be treated as income. If they were not, then to the extent that they were from surplus accumulated before the trust they should be distributed to capital. In the absence of any evidence on the point,

since the burden was on the representative of the remainderman to show that the dividend was payable in whole or in part to corpus, *prima facie* it may be assumed that it is income. *In re Nirdlinger's Estate,* 290 Pa. 457, 139 A. 200, 208.

For the reasons stated, dividends declared by the United States Steel Corporation after the beginning of the trust out of current earnings must also be considered to be income.

The *prima facie* presumption would be too that the dividends declared during the trust period on the stock of the Manufacturers Finance Company must be treated as income. But as the record is silent as to the source of those dividends, that presumption may be overcome by proof that it was paid from capital.

It follows that so much of the decree from which this appeal was taken as awards these dividends to the corpus of the trust estate must be reversed.

> *Decree reversed and cause remanded for a decree in conformity with the views expressed in this opinion, the costs to be paid equally by the parties to this appeal.*

PARKE, J., filed a dissenting opinion as follows:

There are two fundamental questions on this appeal. The first is the *meaning* of Chapter 495 of the Acts of 1929; and the second is, Are the corporate dividends which are in controversy within the *scope* of the statute? The legislation is the first in Maryland on its subject matter, and the enactment is wholly found within a single paragraph:

305C. All rents, annuities, dividends and periodical payments in the nature of income, payable under the provisions of any will, deed or other instrument executed after the first day of July, 1929, shall, like interest on money lent, be considered as accruing from day to day, and shall be apportioned in respect of time accordingly,

unless otherwise expressly stated by the instrument under which they are payable, but no action shall be brought therefor until the expiration of the period for which the opportionment is made. Code (Supp. 1935), art. 93, sec. 305C.

There is no controversy that it is a condition precedent to the operation of the statute that the rights contemplated must originate by the terms of some document in writing. Here the trust, under which successive interests arise in the same subject matter, is created by will, and thus this condition is fulfilled. The claims of creditors do not affect the devolution of the property given in trust; and there is nothing disclosed to interfere with the application of the statute to any income within its contemplation. Thus far there seems to be no divergence of opinion. The difference is about what dividends are embraced within the meaning of the statute. The distribution by dividend either of corporate capital or of assets for the purpose of the liquidation of corporate affairs is not a distribution of income but of corpus itself. Such divisions of corporate capital and of assets in liquidation are clearly not dividends in the sense intended by the Legislature, and so do not constitute a restriction on the scope of the application of "All * * * dividends." The prevailing opinion, however, construes the inclusive adjective "all" of the Act to have this significance with reference to rents and annuities, but to lose this meaning when it reaches dividends, and then to acquire the sense of "some." Thus by the opinion of the majority of this court the statute does not apply to irregular or extraordinary declaration of dividends. Conformably with the opinion, payment of cumulative preferred dividends of a fixed yearly percentage on corporate stock in part discharge of arrears is not within the contemplation of the statute should the distribution of current earnings be made after a suspension and interruption of the annual declaration of the dividend because of past insufficient net earnings. The reasoning of the court in support of this position is best stated in its opinion, which finds

support for its conclusion in the decisions of English courts in the construction of the English statute on apportionment. It is submitted that too much reliance may be placed upon decisions of foreign courts in the construction of statutes, which are distinguished by substantial difference from the domestic act.

1. Statutes adopted from another state or country will generally be presumed to have been enacted with the meaning given to it by the construction placed upon it by the state or country of its origin before its adoption. *Lavender v. Rosenheim,* 110 Md. 150, 72 A. 669. Such construction will be persuasive and will be followed if sound and reasonable. However, the rule is subject to important limitations. One of these is that it will not prevail over the plain and clear meaning of the statute, nor if the statute adopted differs materially in a substantial matter from the statute from which it is derived. *Torrence v. Edwards,* 89 N. J. L. 507, 99 A. 136, 137; *Copper Queen Consol. Mining Co. v. Arizona Territorial Board of Equalization,* 206 U. S. 474, 27 S. Ct. 695, 51 L. Ed. 1143; *Stutsman County v. Wallace,* 142 U. S. 293, 12 S. Ct. 227, 35 L. Ed. 1018. Thus, the English statute on apportionment (33 and 34 Vict. c. 35, 1870), along with the Massachusetts Act, furnished the basis for the enactment of the statute here under construction, yet the English statute was not adopted without material modifications. The statute in Maryland is only similar to the second section of the English statute, whose other sections are wholly omitted. The discarded fifth section is material because it defined the word "dividends" as used in the second section, and gave it particular meaning, so that the statute was made to embrace all dividends, whether periodical or not, which were not in the nature of a return or reimbursement of capital, provided only such dividends must be declared or expressed to be made for or in respect of some definite period. *Re Griffith* (1879), L. R. 12 Ch. D. 655; *In re Jowitt* (1922) L. R. 12 Ch. Div. 422; *In re Bouch,* 29 Ch. Div. 635, 653; *Bouch v. Sproul,* L. R. 12 A. C. 385, 397, 401.

Even in the second section there are significant differences. The Maryland law applies to "all rents, annuities, dividends and periodical payments in the nature of income, payable under the provision of any will, deed or other instrument," while the income designated by the English Act may be "reserved or made payable under an instrument of writing *or otherwise.*" Again, the language of the English Act in this section is "all rents, annuities, dividends and *other periodical* payments." The here italicized adjective phrase "other periodical" is so associated with the antecedent word "dividends" as to limit its meaning to those dividends which are periodical. See *Hubbard v. Taunton,* 140 Mass. 467, 468, 5 N. E. 157; *Alexander v. Greenup,* 15 Va. (1 Munf.) 134, 144. The statute at bar does not contain this qualification of the general meaning of dividends. In thus modifying the wording of the second section of the English statute and rejecting its fifth and other sections which fixed the limited meaning of the word "dividends" as used in the second section, the General Assembly of Maryland declared the legislative intent in its own chosen words. The material changes noted give emphasis to the necessity of applying the domestic statute in accordance with its meaning as found from its own statutory expression rather than from the construction given by foreign tribunals to a substantially different statute. *Blades v. Szatai,* 151 Md. 644, 652-653.

2. The enactment was made so late as 1929 for the purpose of changing the common law rule then in force that rents, annuities, dividends and periodical payments were not generally apportionable. The rule worked unfair results, and it was thought that if these yields of capital were treated as accruing due from day to day in the manner of interest or money lent, and thus made apportionable in respect of time, the inequalities would be removed. In an able treatise on the *Construction of Wills* (1927) by Edgar G. Miller, Jr., an enactment was suggested which is substantially the form of the one passed. Section 120, n. 1, pp. 336, 337.

Not only did inequalities exist because of the effect of the common law rule against the apportionment of rents, annuities and periodical payments, but greater confusion and conflict prevailed with reference to corporate dividends, which fell into ordinary and extraordinary, and money and stock dividends. The rule was established that regular corporate dividends were not apportionable. In respect of extraordinary corporate dividends, whether declared in money or in shares of stock, there was great conflict of authority. These difficulties brought about remedial legislation. In the *Restatement of the Law of Trusts* by the American Institute of Law the whole subject matter is considered, and the law on the subject is formulated, with the qualifying footnote that its rules are not effective where the subject is governed by statute. See Vol. 1, ch. 7, secs. 232, 234, 235, pp. 698-699; 236, p. 702 n.

3. Before the enactment of chapter 495 of the Acts of 1929, the decisions were not harmonious with reference to the apportionment of extraordinary corporate dividends. There was need of statutory clarification. 86 *University of Pennsylvania Law Review*, 681; 2 *Machen on Corporations*, sec. 1389, p. 1150, nn. 3, 4; 4 *Bogert on Trusts and Trustees*, sec. 845, p. 2448, n. 34, secs. 846, 847, 848, 850, n. 98, p. 2463, sec. 857.

The first decision in Maryland on the allocation of a dividend declared payable on corporate stock which was held in trust for the benefit of a life tenant and then over for a remainderman, was rendered in *Thomas v. Gregg* (1894), 78 Md. 545, 28 A. 565. A testamentary trust had been created by a testator, who died on February 11th, 1890. The use of one-half of the estate was given to each of his two daughters for life, and then over in remainder. A life tenant died on July 8th, 1891, survived by a husband and three children, and the life tenant of the other half and her husband. A twenty *per centum* stock dividend for three years ending September 30th, 1891, was declared and made payable in stock of the corporation. A controversy arose over the distribu-

tion of the stock. On the one hand it was asserted to be payable to the tenant for life as income, and, on the other, it was claimed as corpus to be held for the use of the tenant for life and then over to the remainderman.

The resolution that declared the dividend set forth the application by the corporation of the net earnings for the three fiscal years ending September 30th, 1891, and stated that there remained of the net earnings and income of the company a sum which, in addition to amounts derived from other sources, had been used in reduction of the bonded and car trust indebtedness of the company to the amount of $1,325,102.64, and, also, for the permanent improvement of the railway and for new construction, all of which constitute valuable additions to the property and to the capital assets of the company, and so a common stock dividend of twenty *per centum* was declared upon the common stock of the company for the period named.

The court considered the conflicting rules enforced and came to the conclusion that the best rule permitted the disregard of the presumption that a dividend on the common stock, when declared in stock, is to be deemed capital and, when declared in money, is to be deemed income, is not conclusive and, so, that the form of the dividend may be ignored, and its real nature determined. The principle there established was that, if it could be certainly known that the distribution in the stock dividend included net profits, and their proportion was known, and such proportion of net earnings, although formerly used as capital, had been so employed temporarily and with the intention on the part of the directors of the corporation of refunding such net profits as so applied to the shareholders as income, it would thereupon become the duty of equity to make the investigation required, and dispose of the stock in an equitable distribution between the tenants for life and the remaindermen. Pages 556, 557.

After reaching this opinion, the court was confronted with the action of the corporation which clearly disclosed

that the dividend was of profits which had been carried by the corporation to its capital account, and so the court was obliged to resort to the testator's will, and to find from it the intention of the testator that the life tenants were to have the benefit of all the income from the testator's property.

The intention of the testator must have been given paramount weight for these reasons. In the absence of a clear abuse of their discretion or of fraud, the directors of the corporation had the discretion to dedicate net earnings to the capital requirements of the corporation. In the event of such an application, the stockholders had no right to the disbursement of such earnings in a dividend on stock. Nor, in the absence of misconduct, did the court have any concern with the appropriation of income in corporate affairs, and could not substitute its conception of the judicious use of corporate net income in order to make and enforce a different application or use from that lawfully adopted by the accredited agents of the stockholders in the management of corporate affairs. The shareholders were bound to anticipate the capitalization of net earnings by appropriate corporate action, and the distribution of stock to the shareholders was the final corporate action to evidence and to consummate the capitalization. Thus, while the allocation of a corporate dividend to trust corpus or to income is a duty of the trustee, and may be properly brought within the province of a court of equity, nevertheless neither the duty of the trustee nor the occasion for the chancellor to act may arise where, in the absence of an abuse of discretion or of fraud, there has been no dividend declared of corporate net earnings. Hence, whether the dividend is a capitalization of net earnings or their distribution by payment is a vital distinction in deciding whether the dividend to a trustee is to be distributed by him as income or held as part of the corpus of the trust.

The court exemplified the practical operation of its decision by ruling that the fiscal period for the ascertainment of net earnings should be six months, if that be

practical, and, if not, the fiscal year of the company should be taken as the period. For the life tenant to become entitled to the net profits of such periods, she must be alive at the end of the period. So, the testator having died on February 11th, 1890, the proportion of the net income embraced in the stock dividend for the fiscal year ending September 30th, 1889, was capital, and the stock which represented this amount became a part of the corpus of the trust. The life tenant, Annie G. Thomas, died on July 8th, 1891. If practical to compute the net earnings on a six months' basis, the net earnings during the period from September 30th, 1889, to March 31st, 1890, to September 30th, 1890, to March 31st, 1891, would pass in the form of stock to the estate of Annie G. Thomas as income, but if the calculation had to be made on a yearly basis, the net earnings for the fiscal year expiring on September 30th, 1890, would fix the proportion of the stock dividend to go to the estate of the dead life tenant. The proportion of the net income from either September 30th, 1890, if on a yearly basis, or March 31st, 1891, if on a six months basis, would pass in the form of the proportionate number of shares of the stock dividend to the capital or corpus of the trust.

The next case is that of *Quinn v. Safe Dep. & Tr. Co.* (1901), 93 Md. 285, 48 A. 835. A testamentary trustee was directed to pay the net income of the trust to the testator's children for life, and then over. A part of the trust estate was shares of stock in the Canton Company, which had endorsed certain bonds of a mortgagor, and had accumulated a sinking fund, which was in the form of money and ground rents, for the purpose of paying the bonds at maturity. Practically all of this fund had been set aside before the testator's death. The bonds were paid off by another company, and the sinking fund thereby became discharged and available for the corporate purposes of the Canton Company. The directors passed a resolution declaring an extraordinary dividend of ten dollars a share out of the money and retained the ground rents as a capital investment. The sum of $4,000

was the dividend received by the trustee, and of this amount $3,814 had been accumulated before the testator's death, and $184 had been the net profits carried to the fund after the testator's death.

It was argued that *Thomas v. Gregg, supra,* controlled, and that the real nature of the dividend should be investigated, and that portion which had been amassed out of earnings before the testator's death was capital, and that only the comparatively small sum which had been earned after his death was payable to the life tenants as income. The court held the dividend was income and applied the principle that, in the absence of bad faith, a company's distribution of its net profits in a dividend in money or its conversion into capital is a valid exercise of power if conferred, and is binding upon all parties in interest, and consequently what is paid as dividend goes to the tenant for life, and what is paid by the company to the shareholder as capital or is appropriated as an increase of the capital stock of the concern enures to the benefit of all who are interested in the capital. It is difficult to reconcile these two decisions. *Bogert on Trusts and Trustees,* sec. 845, n. 34, p. 3448. While there is the difference of a dividend of stock, in the first case, and of money, in the second, the fundamental question in each case is the power of an equity court to investigate and determine whether a lawful dividend, no matter its form and what it may be determined by the declarant to be, is a distribution of net income or of capital, and whether, and in what part, it is payable and receivable by the tenant for life or the remainderman. In the first case, the court declined to accept as capital a distribution so declared by the declarant, and, in the second case, the court refused to disturb the action of the declarant, although in both instances the distribution was fundamentally of retained and dedicated net earnings. In short, in *Thomas v. Gregg, supra,* the decision was inconclusive and would seem to be controlled by the testator's intention as found in his declaration of trust rather than by any unequivocal adoption of what is known as the

Pennsylvania rule. In the later case of *Quinn v. Safe Dep. & Tr. Co.*, *supra*, the court ignores the Pennsylvania rule, and refers to decisions which enforce the doctrine of the Massachusetts courts. *Boucher v. Sproul*, L. R. 12 App. Cas. 385; *Gibbons v. Mahon*, 136 U. S. 559, 10 S. Ct. 1057, 34 L. Ed. 525; *Bates v. McKinly*, 31 Beavan 280; *Van Doren v. Oldin*, 4 N. J. Eq R., 176; *Richardson v. Richardson*, 75 Me. 570; *New York etc. Co. v. Nickals*, 119 U. S. 296, 7 S. Ct. 209, 30 L. Ed. 363.

However in the *Atlantic Coast Line Dividend Cases* (1905) 102 Md. 73, 61 A. 295, the court cites both cases in support of the proposition that "when a dividend based upon the earnings of a company is declared payable in stock and the company had the power of so distributing it, and this power was validly exercised, it is to be treated as income and not capital, and goes to the tenant for life." The court was speaking with reference to an extraordinary dividend of twenty *per centum* declared upon the existing capital stock of a corporation, and payable in the stock of that company. The railway corporation in question was formed in 1900, and in November, 1904, the directors passed a resolution, which was later approved by the stockholders, whereby it was stated that the surplus net earnings justified the dividend mentioned, and that it should be declared, and that for this purpose the capital stock of the company should be increased so as to provide for the issue of the stock dividend. While the terms of the testamentary trust were quite broad and inclusive, and the court did say that it "is quite clear and there can be no question, that under its provisions, the dividends are payable to the appellee," nevertheless the court rested its opinion on the doctrine that the declaration of a stock dividend based upon the "surplus net earnings of a corporation throughout a period of years is income and not capital and goes to the tenant for life." In this case there existed the particular feature that the profits distributed were the net earnings of the company *during* the existence of the trust. The decision last cited is later, and the reasoning

of the court seems definitely to abandon the position of the court in *Quinn v. Safe Dep. & Tr. Co., supra,* and to adopt the decision in *Thomas v. Gregg, supra,* as controlling. *Ex parte Humbird,* 114 Md. 627, 634, 80 A. 209; *Coudon v. Updegraf,* 117 Md. 71, 80, 83 A. 145.

In *Foard v. Safe Dep. & Tr. Co.* (1914), 122 Md. 476, 89 A. 724, it was held that surplus earned before the death of the testator, and distributed in the form of an unusual dividend declared after his death and made payable in money, was corpus of the testamentary trust created by the testator, and not income which was payable to the life tenant under the trust. The dividends of earnings, which had accrued after the death of the testator, were income which was payable to the life tenant, no matter whether the dividends be in cash, scrip or stock. *Washington County Hospital v. Hagerstown Trust Co.,* 124 Md. 1, 7, 8, 91 A. 787. After the two cases last cited, the *Northern Central Dividend Cases* (1915), 126 Md. 16, 94 A. 338, were decided. The decision distinguishes between dividends of stock, and dividends of money. With reference to dividends which are payable in stock, the rule applied was that of *Thomas v. Gregg, supra,* and a stock dividend that represented earnings which had been expended for betterments was declared apportionable between life tenants and remaindermen where earnings accruing during the life estate were included in the earnings so applied. On the other hand, it was said, on the authority of *Quinn v. Safe Dep. & Tr. Co., supra,* that a dividend payable in money should go as income to the life tenant without regard to when the earnings or income accrued. *Compare Foard v. Safe Dep. & Tr. Co., supra.* In the *Northern Central Dividend Cases, supra,* at pp. 29-30, the court, writing in reference to the cash dividends, quoted from *France* on *Corporation Law,* 280, the statement: "As between successive owners of a share, the dividend belongs to him, who is the owner at the time it is declared; and this is true although there is a future day of payment. Such is the rule also when there are successive interests in the same

share as in the case of life tenant and remainderman; there will be no apportionment when the life tenancy expires between dividend days." *Miller v. Safe Dep. & Trust Co.*, 127 Md. 610.

It is not perceived upon what sound equitable basis the form of the dividend is determinative of whether it is apportionable. The rule of apportionment is equitably rooted in substance as against form, and, so, its genesis and theory alike demand that in equity income and corpus be awarded without regard to the form in which income or capital is distributed in dividend among corporate shareholders. *Matter of Osborne*, 209 N. Y. 450, 477, 103 N. E. 723, 731; *Mandeville's Estate*, 286 Pa. 368, 370, 133 A. 562, 563; *Rhode Island Hospital Trust Co. v. Packhorn*, 42 R. I. 365, 372, 107 A. 209, 212; *Restatement, Trusts*, sec. 236b, comment S; 86 University of Penna. Law Review, p. 111.

While no later case upon the question has been found where the question has been decided by this tribunal, a preference is indicated for the logical rule as stated and given effect in *Foard v. Safe Dep. & Tr. Co., supra.* See *Krug v. Mercantile Tr. & Dep. Co.* (1918), 133 Md. 110, 116, 104 A. 414; *Spedden v. Norton* (1930), 159 Md. 101, 105, 150 A. 15; *Baldwin v. Baldwin* (1930), 159 Md. 175, 180-184, 150 A, 282; *Bogert on Trusts and Trustees*, sec. 844, p. 2446:

It would seem incontrovertable that a review of the prior decisions of this tribunal demonstrates that conflict and inconsistency exist. In *Thomas v. Gregg* (1894), *supra,* and *Quinn v. Safe Dep. & Tr. Co.* (1901), *supra,* basically different rules and principles are enforced in determining what shall be allocated as trust income and what as trust corpus. Again, in the determination of the inquiry whether the dividend declared is a distribution of capital or of net earnings, the statement of the corporation in reference to the source of the dividend is held conclusive, and this presumption is operative if the dividend be of stock, or of money or made payable out of current net earnings or past undistributed net profits, whether car-

ried as surplus or allocated to capital and invested in tangible capital assets. Thus the court of equity, which justifies its intervention between life tenant and remainderman on the ground of preserving the equities of substance as against the *prima facie indicia* of form, surrenders the ascertainment of the factual basis upon which such equities depend to the decision of the corporation, unless its action be vitiated by fraud. *Northern Central Dividend Cases*, 126 Md. 16, 28, 94 A. 338; *Atlantic Coast Line Dividend Cases*, 102 Md. 73, 61 A. 295. It is inconsistent with the equitable theory to give more than presumptive verity to the corporate declaration. *Bogert on Trusts and Trustees*, sec. 850, p. 2463. Again, with reference to whether there is any apportionment between life tenant and remaindermen between dividend dates, the decisions are not harmonious where the dividend is of stock (*1*) or of money (*2*). Compare (*2*) *Quinn v. Safe Dep. & Tr. Co., supra,* with *Northern Central Railway Dividend Cases, supra;* and (*1*) *Thomas v. Gregg, supra,* with *Northern Central Dividend Cases, supra* (stock).

4. Although the tendency of the later decisions of this court is to affirm a modified form of what is known as the Pennsylvania rule, the decisions are seen not to have been wholly consistent. In view of this difficulty and drift of the later decisions from the Pennsylvania rule, a solution of some of the problems was sought in the remedial legislation of chapter 495 of the Acts of 1929. The statute is presumed to have been enacted by the Legislature with full knowledge of the existing condition of the law; and the meaning and effect of the statute are to be determined with reference to the decisions of the court on the subject matter. 4 *Bogert on Trusts and Trustees,* sec. 844, p. 2446, sec. 857, pp. 2483-2486. With this background and the state of the law in mind, the construction of the statute must be made.

The general rule is that where by will or other instrument a party is made the beneficiary for a designated period, he is entitled to the income of the trust from the

date of the death of the testator, or the date of the instrument executed by the donor or settlor, unless it is otherwise provided in the will or other instrument. The situation, therefore, before the passage of the statute of apportionment, was that the income received by the trustee from the property held in trust, other than that income received from rents, annuities and ordinary dividends on shares of stock, which did not accrue wholly within the life tenancy or designated period, was apportionable; and (*a*) such portion of such income as accrued during the life tenancy or designated period should be distributed as income, and (*b*) such portion as did not accrue during the life tenancy or designated period should be added to principal. The exclusion from this general rule of rents, annuities and ordinary dividends on shares of stock is because these forms of income were not apportionable at common law. In order to introduce equality and uniformity among successive interests in rents, annuities, dividends, and periodic payments of income, the General Assembly of Maryland passed chapter 495 of the Acts of 1929.

There is no sound reason why there should not be an apportionment of ordinary dividends as well as of extraordinary ones. 2 *Machen on Corporations,* sec. 1388, p. 1149; *Lang v. Lang,* 57 N. J. Eq. 325, 328, 41 Atl. 705. The statute employed apt words to bring both equally within the enactment. So to include either ordinary or extraordinary dividends and to exclude the other is a violation of the positive expression of the Legislative will, and a defeat of its purpose to produce uniformity in the apportionment of corporate dividends.

5. The statute does not relate to some dividends, but explicitly embraces "*all*" dividends of income. So long, therefore, as the dividend is of income, as contradistinguished from a distribution of capital or by way of liquidation, the dividend, whether ordinary or extraordinary, is apportionable by the statute. It is true that income in the form of rents and annuities is founded in contract, and assumes the form thereunder of a definite sum of

money which is periodically payable by agreement to a certain person. So, the amount of the default and the period the payment of the income remains unpaid are fixed and known, and the default is actionable. A dividend, however, is not in default until declared, and until then no right of action at law exists. Although the rate of dividend is sometimes agreed, and its payment periodically may be contemplated in the issue of stock or be established by custom, yet the relation of corporate debtor and creditor does not arise until the declaration of a dividend is made. Thus the right to the payment of rents or annuities is absolute according to the terms of their creation, while the legal right of a shareholder to dividends does not arise until a dividend has been made and declared, although the amount of the profits and the condition of the corporation are such that the shareholder could compel the directors to make a distribution of the profits. The present vested right to rents and annuities is in contrast with the potential right to a dividend, which is not vested until the dividend is made and declared. Whatever their distinguishing differences, the statute has made them common in being apportionable and, like interest on money lent, rents, annuities and corporate dividends are considered as accruing from day to day, and as apportionable in respect of time accordingly. The condition for an apportionment under this statute exists where there are successive interests in the same rent, annuity, or corporate stock. So, the apportionment between the successive interests is with reference to the particular period of payment in which one interest ends and the successive interest begins. With a rent or annuity the stated sum is payable annually or periodically, so the period of apportionment presents no difficulty, as the period, within which the successive interests subsist, coincides in time with the contractual obligation to pay at the due date the accruing rent or annuity. There is no such co-existence in the case of a dividend. However, when, with the declaration of a dividend, the relation of debtor and creditor comes simulta-

neously into being, the dividend, by force of the statute, must be accepted as having previously accrued from day to day in respect of a period of time immediately precedent to the day of the declaration of the dividend. The end of the period is thus fixed, but the day of its beginning cannot be ascertained by resort, as in the case of rents and annuities, to a definite contractual period. There are analogies, however, which are determinative. Rents, annuities, and corporate dividends are alike the product of capital at work. In common they represent the yield of invested principal. The apportionment to be made is not based upon the amount either of the rent, the annuity, or the dividend, but is grounded on the period of time within which successive interests must be adjusted. If the capital of a corporation is productive uniformly of net earnings in an amount sufficient to assure the declaration of regular dividends at fixed intervals, the period of apportionment would certainly be between the customary dividend dates. Should the corporate capital decline in net yield, and the regular declaration of dividends cease and the making of dividends would become either irregular, as the fluctuating earnings and condition of the corporation would require, or occasional, as in the making of an extraordinary dividend, these circumstances would reflect upon the earning capacity of the capital employed and the rate in time of its productivity, but would not affect the principle that between successive interests in the same shares of stock the apportionment of income in the form of dividend from stocks, when made with reference to a statutory accrual from day to day, must be between dividend dates, however separated in time, unless no prior dividend had been made, when the period would be between the time of the issue of the shares and the first dividend declared. Thus, through the creation of the fiction of a uniform accrual, from day to day, until the day of the declaration or due date of the ultimately declared dividend, the statute made certain a definite period of time with reference to whose length in days

the proportionate shares of the successive interests in the amount of the dividend would be ascertained. As thus construed, both regular or ordinary, and irregular or extraordinary, corporate dividends, which are declared in the distribution of net earnings and profit, are apportionable under the provisions of the statute.

6. The probability that a long period of time may elapse between the date of the dividend involved and (*a*) either the date of the last preceding dividend, (*b*) or the date of the issue of the original issue of the stock, in the event there had been no earlier dividend, is a circumstance which relates to the *length* of time during which by statute the dividend is declared to have accrued from day to day. During this period the principal has been employed to earn a yield, and, so, the relative space in time of the period does not militate against the construction given. Whether the duration be long or brief, the language and the purpose of the Act is unaffected. See *In re Griffith, Carr v. Griffith* (1879), L. R. 12 Ch. D. 655.

Again, the settlor, donor, or testator has no right to a dividend on corporate stock until one is declared and becomes payable. So, no question of apportionment can arise until the dividend is due. Hence, the transfer, before the dividend is declared and is due, of title by the instrument under which the successive rights in the stock arise, transmits, unless reserved, all the interest of the testator, donor, or settlor. Should a dividend be later declared, the then instant rights of the subsisting and successive parties in interest in the shares of stock and the income therefrom are determined among such parties as their relative rights may exist at the time the dividend has become due. Consequently, the construction here given the statute does not create, as has been urged, delays and new difficulties in the settlement and administration of estate. By embracing within its scope both ordinary or regular and extraordinary or irregular dividends of corporate income, and making their distribution among successive beneficiaries with reference to certain

or readily ascertainable periods of time, upon the assumption that the amount of the dividend had accrued from day to day, the apportionment statute introduced into the distribution of corporate dividends an equal degree of certainty and simplicity with what prevails in the apportionment of interest on money lent.

7. The advantages of the simple, arbitrary, universal rule which the statute had adopted makes, in most instances, but not always, for substantial justice. It conforms closely to the rule which is enforced under the leadership of the appellate courts of Massachusetts and other influential tribunals which allot corporate dividends of money to trust income. *Bogert on Trusts and Trustees,* sec. 851, p. 2464; sec. 843, p. 2443; sec. 857; *Gibbons v. Mahon,* 136 U. S. 549, 10 S. Ct. 1057, 34 L. Ed. 525. It relieves the fiduciary of many heavy responsibilities, such as ascertaining the intact or original dollar value of the trust corpus; or whether the dividend is declared from surplus which was earned before or after, or partly before and after, the operative date of the instrument creating the successive rights; and, if accumulated partly before and after either the operative date of the instrument or the termination, during the period of the operation of the instrument, of a successive right of income, what are the relative amounts of the income which had accumulated before and after such points of division. The discharge of such duties would oblige the fiduciary to obtain information from the corporation, which he may act upon and so run the risk of its accuracy. If he should desire to go back of such information and assure himself of the true condition of the corporation, he would require expert aid, and, the greater the length of time included by his inquiry, the more costly it would become, especially if the corporation is of foreign origin or location. Not every fiduciary would be competent nor possess the facilities to fulfill these obligations, nor is every trust or fund possessed of the financial resources to acquire the necessary information. So a fiduciary would be frequently compelled to choose among expensive

investigation, litigation, or the assumption of a risk which he ought not to bear. These considerations argue for the reasonableness of the construction of the statute here maintained. Even in those circumstances where the statute may not prove to be theoretically fair, nevertheless its practical effect may, because of its simplicity, certainty, and ease, prove, in the long run, more economical, sensible and beneficial than an abstractly just rule. See *Bogert on Trusts and Trustees*, sec. 857, pp. 2484, 2485. Compare *Perry on Trusts* (7th Ed.), secs. 544-545A.

8. Before leaving the subject, it should be stated that the construction here advocated does not bring within the purview of the statute a distribution of corporate earnings in the form of an issue of the capital stock of the corporation to its shareholders. It is true that the issue of authorized capital stock has been frequently held to be income, in an attempt to do equity, although no legal right exists or is denied. The error lies in failing to keep in mind that until a dividend out of corporate earnings is made, neither the testator, donor, nor settlor, nor his personal representatives, nor the beneficiaries, may be heard against the appropriation made in good faith by the corporation of its earnings and income. The appropriation may be to dividend or to capital, and such corporate action is implicitly authorized and contemplated in the ownership of capital stock. *Supra.* When, therefore, the corporation permanently dedicates its accumulated earnings to capital, and evidences that action by the issue to its shareholders of shares of its capital stock, the stock so received is capital. The corporation has made its final election, and its shareholders are thus bound.

Nor does there appear any sufficient ground for equity to intervene and alter the legal rights of the parties. In the declaration of a dividend whereby the surplus or accumulated earnings are distributed in money, there is no capitalization of the earnings, and the relative position of the life tenant and remainderman with reference

to their future relative rights in the corpus of the trust estate, so far as the particular corporation is concerned, is unaffected. The equality mentioned is maintained if there be a capitalization of the accumulated earnings of the corporation, and it be distributed by a stock dividend, if the stock received be carried to the corpus of the trust. The assets of the corporation would remain undiminished, and the share of the trust would be the same, since the net earnings, whether current or accumulated, would have their equivalent value embraced in the increased capital stock wherein they were capitalized. Actually no payment would occur, but there would be an allocation of earnings by their transfer to the capital account. The share of the trust in the aggregate assets would be expressed in terms of a fraction, whose denominator and numerator, while greater numerically, would continue to denote the unchanged fractional proportionate interest or share of the trust in the corporate assets. If the dividend is thus capitalized, and, as between life tenant and remainderman, the shares of stock received by the trust estate be allocated to trust corpus, the relative position and rights of such successive owners would be recognized and assured by the life tenant enjoying its use for life, and the remaindermen acquiring its residue in value at the end of the life interest. Thus the successive owners would get the full measure in value of their rights, without inequality.

On the other hand, if the stock dividend is to be taken as trust income and given to the life tenant, equality of estate and enjoyment is destroyed. Not only does the remainderman permanently lose every interest in the stock dividend declared, since the shares of stock become the absolute several property of the life tenant, but the trust estate is correspondingly depleted by reason of the fact that the number of shares of stock transferred by the instrument which created the interests in succession remains constant, while the number of shares of the corporation is increased by the total number of the shares of the stock dividend. In other words, by increas-

ing the number of shares the value of each outstanding formerly issued share is proportionally lessened. So the shares of stock held in remainder are reduced in value as their proportionate share of the corporate property is thus diminished. To increase numerically the denominator of the fraction which represents the total number of shares into which corporate ownership is divided, and to have remain unchanged the numerator, which expresses the number of shares held in remainder, illustrates mathematically how inevitably, and in what proportion, the loss in value of the shares of stock held in remainder must follow the allocation of the issue of capital stock to income. Nor is it true that the shares of new stock issued were paid for by the sum of the net earnings thus capitalized. They were not so bought. As pointed out by Lord Bramwell in *Bouch v. Sproule* (1887) L. R. 12 A. C. 385, at 407, "The price of the new share was that sum and the diminished value of the old shares." It must be concluded that neither by legal right nor upon any equitable principle may the life tenant or other lesser tenant in time be awarded a distribution of capital stock as corporate income. The subject matter of the statute of apportionment in Maryland is income, and not principal, and there appears no reason to enlarge its meaning to include a distribution of capital stock, whose apportionment as income would be to the prejudice of the interest of the remainderman.

9. The next inquiry is what dividends are involved on this appeal. The testator at the time of his death held shares of stock which fell into the two general divisions of preferred and common stock. The preferred stock division was composed of cumulative and noncumulative preferred stock. With regard to the allocation of dividends, the stocks are separable into three classes. The *first* embraces the preferred and common stock on which no dividends have been paid after the testator's death, and, therefore, these shares present no immediate problem. The *second* class is composed of certain other common and cumulative preferred shares

of stock on which the ordinary dividends on common stock and the full dividends on preferred stock have been declared after the death of the testator for the regular annual or less periods which began last before, and ended after, the death of the testator, but during the period of life tenancy, and were payable in money out of the net earnings of the respective corporations for such regular dividend periods. Such ordinary dividends are income, and *unless changed by the statute,* should all pass to the tenants for life.

While the language of the final decision in the instant case does not expressly limit the scope of the application of its language to extraordinary dividends, it would seem that this is the necessary implication. The court bases its consideration of the case on its preliminary finding that the dividends in controversy are *not* regular or ordinary, but *are irregular or extraordinary,* dividends. It, therefore, must be assumed that the court has not decided the effect of the statute on ordinary money dividends, which by explicit legislation are declared to accrue from day to day, and are made apportionable in respect of time unless otherwise provided by the instrument under which the income is payable. Code, art. 93, sec. 305C; Acts of 1929, ch. 495.

It is the opinion of the writer of this dissent that the opinion should have considered dividends of the second class, and held them apportionable by force of section 305C, *supra.*

The *third* class is formed by another group of cumulative preferred shares of stock, on which no dividends at the expiration of the corporate fiscal year or other regular dividend period had been declared and paid for some time before the testator's death; but, after the death of the testator, dividends, in usual amount, had been resumed and declared and paid out of current net earnings and applied in discharge of part of the arrearages which had accumulated on account of the cumulative dividend. The prevailing view is that such a dividend is an irregular or extraordinary dividend, whether

declared in money or in stock, and not within the scope of the statute. The nature of the dividends involved in this third class may be considered by particular reference to the dividends declared by the B. V. D., Inc., on its cumulative preferred stock, which the testator held at the time of his death on July 28th, 1936. The corporation was formed to acquire certain corporate enterprises. It was created in 1929, and the value of its corporate assets was in excess of its authorized capital common and preferred stock. This excess represented, it is said, the net profits of the acquired corporations, but it must be regarded as contributed surplus, which entered substantially into the book value of the stock at the time the testator acquired the stock. 4 *Bogert on Trusts and Trustees,* sec. 842. It was designated by the corporation as "paid in capital surplus." The operations of the company were not uniformly successful, but dividends on the preferred stock were paid out of this contributed surplus in a large sum during the ownership of the testator, but all dividends had ceased after the fiscal year ending on August 31st, 1932; and these cumulative accrued dividends had grown to the sum of $1,236,759.88 at the close of the fiscal year on August 31st, 1936. The payment of dividends on the preferred stock was resumed in 1936 when, at a meeting held on December 14th, 1936, a dividend of $6.50 a share was declared for the period beginning on December 1st, 1931, and ending November 30th, 1932, and payable on December 21st to stockholders of record at the close of business on December 18th, 1936.

The portion of the dividends on the preferred stock which was paid out of the contributed surplus of the company before August 31st, 1932, was a distribution of the contributed surplus or capital of the corporation during the lifetime of the settlor, and so does not concern us here. The company had not paid any part of the preferred cumulative dividends from the close of the fiscal year on August 31st, 1932, until the declaration of the dividend in December, 1936. A large amount of pre-

ferred cumulative dividends had accrued during this period. The resumption of dividend payment was out of current net profits, and so the dividend was of corporate earnings which were necessarily applied as a dividend credit on the arrearages of preferred dividends, in order that the corporate duty to pay the agreed preferred cumulative dividend might be discharged to the extent of the net profits available for that purpose, and, so, after the accrued due preferred dividends were ultimately so paid, the corporation might eventually be free to declare as well a dividend on the common. The dividend so declared was at the close of the fiscal period, and at the annual rate which was specified in the issue of the authorized preferred stock, and was for the normal period of one year; so, although the declaration had been deferred, it was not in any accurate sense an unusual or extraordinary dividend. On the contrary it possessed every feature of an ordinary dividend whose regular declaration was interrupted solely because of an anterior absence of available corporate profits.

There was nothing unusual in time or size of the dividend. Is it to be said that because a contemplated cumulative dividend on preferred stock is not annually paid on account of lack of corporate profits, it becomes thereby, when payment is resumed, an extraordinary dividend? It is submitted such a dividend, when resumed, lacks every element of the irregular or extraordinary. What the corporation proposes to do regularly, year by year, at a specified rate, when and as the corporate profits allow, cannot be said to be extraordinary when done, even though an interruption or suspension in declaration has occurred through the corporation's financial position. The fact that the dividends on the preferred stock are cumulative when unpaid is a demonstration that an inability or failure to pay periodically and regularly was anticipated and provided for as a not unusual corporate event. See *Restatement of Law of Trusts*, sec. 236, comment on clause (a), sub-sec. c, p. 703.

10. Whether the dividend of net income and earnings

be regular or ordinary, irregular or extraordinary, the construction adopted by this dissent would make the dividend discussed apportionable under the statute. There is, however, this distinction to be observed with regard to dividends which in their nature are regular or ordinary, and those which are irregular or extraordinary. These represent two classes, and, in determining the period of statutory accrual in time which precedes the dividend, on a class of stock, the length of time is computed with reference to that particular class. In the statute, dividend is used generically, and the two classes are the included species of dividends. The apportionment is of the distribution of net earnngs or profits accruing by statute from day to day on one of the species, and so the apportionment must be made with reference to the periods of time in respect of that same species, since, to get the proper ratio of division, the periods of intervening time must be in relation to the same species of dividends, as like must be brought in comparison with like.

11. The effective date of the dividend may be the date of its declaration or the record date for the ascertainment of the stockholders to receive the dividend. Code, art. 23, sec. 15; *Brune on Maryland Corporation Law,* sec. 72, pp. 93, 94, 432, 371. So, an apportionment of the relative rights in a corporate dividend of the personal representative of the testator, donor, or settlor, of the tenant for life or other period, and of the remainderman, would arise if (*a*) the effective date of the instrument or (*b*) the termination, within the period of the operation of the instrument, of the tenancy for life or other period, would be in time either between successive effective dividend dates of the same class of dividends; or, should it be a first dividend on the stock, between its effective date and the prior date of issue of the original issue of those shares of stock which represent the capital so invested.

Thus, except as otherwise provided by the terms of the instrument executed by the testator, donor, or set-

tlor, the whole dividend so received would be apportioned with respect to an entire space in time, whose length, accordingly as the facts would determine, is either the number of days: (*1*) between the date of the original issue of the shares of stock (*which represents the capital invested*) and the effective due date of the first declaration of a similar dividend of net earnings or profits (*which represents yield or income of capital invested*); or (*2*), in the event there had been a previous similar dividend, between successive effective due dates of the last antecedent similar dividend and the current similar dividend.

Having thus found the length of days of the entire period during which by the statute the dividend declared had been accruing from day to day during that period, the whole dividend would be apportioned in the ratio of the number of days of the whole period before the day the instrument of the testator, donor, or settlor became operative to the number of days of the whole period after such operative day. So that the amount of the dividend so found to have accrued during the portion of the period before the operative day of the instrument would form a part of the principal or corpus of the property which the testator, donor, or settlor intended to be transferred by the instrument which created the rights of successive interests, and the residue of the dividend or the amount which so accrued during the portion of the period after the operative date of the instrument would be income for distribution to the party entitled by the terms of the instrument.

If the operative date of the instrument be before the beginning of such statutory corporate period of accrual of dividend from day to day, the total dividend so declared due is distributed as income so long as there is a beneficiary for life or other period. The rule of apportionment as stated is applicable where there are two or more successive life tenants or beneficiaries of designated periods of successive enjoyment of income; and, also, as between beneficiaries and remaindermen. Compare

*Restatement of the Law of Trusts,* ch. 7, sec. 235, pp. 697-701.

Having dissented from the opinion in *Zell v. Safe Dep. & Tr. Co., Executor,* 173 Md. 518, 196 A. 298, and from the first opinion in the instant case, and being unable to agree with the additional opinion of the court, the grounds of these dissents should be stated by way of explanation.